IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 22, 2004 Session

PAUL G. SUMMERS, in his capacity as ATTORNEY GENERAL AND
REPORTER FOR THE STATE OF TENNESSEE v. ESTATE OF JAMES
W. FORD, M.D.

A Direct Appeal from the Probate Court for Shelby County
No. C-5408000     The Honorable Robert Benham, Judge

No. W2003-00159-COA-R3-CV - Filed March 17, 2004

This is an appeal from the order of the probate court on a claim filed against an estate by the Tennessee Attorney General pursuant to the authority granted by the Nonprofit Corporation Act. The probate court denied the claim in part and granted the claim in part by various rulings concerning the existence of a nonprofit public benefit corporation for operation of child daycare centers, the ownership of assets thereof, and continued operation of the centers. The estate appeals and the Attorney General appeals. We affirm in part, reverse in part, and remand with directions.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Probate Court Affirmed in Part,
Reversed in Part, and Remanded with Directions

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Kathleen N. Gomes, Memphis; Ruby R. Wharton, Memphis for Appellant, Estate of James W. Ford, M.D., Deceased

Paul G. Summers, Attorney General and Reporter; Dennis J. Garvey, Deputy attorney General; Albert L. Partee, III, Senior Counsel; George S. Bell, III and Victor J. Domen, Jr., Assistant Attorneys General, Nashville, For Appellee, Paul G. Summers in his official capacity as Attorney General and Reporter for the State of Tennessee

OPINION

James W. Ford ("Decedent" or "Ford") was an opthamologist, the pastor of Fellowship COGIC Church, a City Councilman, and then a County Commissioner. Sometime in early 1994, Ford began a plan to open a daycare center for underprivileged children in Memphis. This endeavor

led to the opening of four (4) daycare centers in Shelby County, Tennessee, under the name of Children's Palace Learning Academy ("CPLA").

Ford died November 27, 2001, and, on January 28, 2002, a Petition was filed in Shelby County Probate Court to admit his Last Will and Testament to probate and appoint Joyce Ford Miller and Barbara Ford-Branch, Decedent's sisters, as Co-Executrices.

On February 26, 2003, the Co-Executrices filed a Petition pursuant to T.C.A. § 30-2-0322 for authority of the court to continue the operation of Decedent's business, Children's Palace Daycare. The Petition alleges, in relevant part:

> 1. That Decedent was operating four (4) day care operations in Memphis, Shelby County, Tennessee prior to his death. The businesses were located at the following addresses.
>
> a. 4404 Elvis Presley Blvd. Memphis, Tennessee
> b. 851 Thomas, Memphis, Tennessee
> c. 2451 Summer, Memphis, Tennessee
> d. 657 Chelsea, Memphis, Tennessee
>
> 2. That Decedent incorporated himself in April, 1994 and expected to operate as Children's Palace Learning Center, Inc. Petitioners state this corporation has been designated inactive. As a result, when decedent died, his business was being conducted as a sole proprietorship...

On March 11, 2002, counsel for the Estate filed a "Report of Estate's Current Status," which reads, in pertinent part, as follows:

> The exact structure or form of the Day Care business is not clear. It would appear that there was a Corporation established however the failure to comply with certain state requirements may have rendered this Corporation administratively dissolved and/or voidable...

A "Comprehensive Report of the Children's Palace Learning Academies" is an attachment to the above status report. It states that there are four (4) daycare centers "operating in a profit margin," with 387 children attending.

On March 19, 2002, the trial court signed an "Order Authorizing the Continuation of Business." This Order reads, in relevant part, as follows:

This cause came on to be heard upon the Petition of Joyce Ford-Miller and Barbara Ford-Branch, Co-Executrices of the Estate of James W. Ford, M.D.; upon the sworn statements in open Court of the Co-Executrices, Mrs. Elise Evans, Mr. Sidney Goldstein, Mr. A.C. Hooper and Ms. Ophelia Ford; upon statements of counsel for the estate and upon the entire record, it appears to the Court and the Court finds as follows:

1. That the Co-Executrices are authorized to continue the operation of the four (4) daycare centers of the decedent, known as Children's Palace Learning Academy, until the next hearing in this matter, April 22, 2002.

2. That the Co-Executrices are ordered to establish four (4) separate bank accounts for this estate and they shall be as follows:

(a) A bank account for the operation of all the daycare centers. All assets and disbursements relating to the daycare centers should be paid from this account. It is understood that this may be restructured and evolve at a later time into four to five separate accounts.[1]

(b) A bank account regarding everything involving the real estate of the decedent.

(c) A bank account for everything relating to the medical practice.

(d) A bank account for the operation of the estate.

3. The Co-Executrices are ordered to prepare and submit a budget for the operation of the daycare centers to the Court and to all the heirs of the estate.

4. That the Co-Executrices are to provide a written financial report on a monthly basis to the Court and to all the heirs on the economic condition of the daycare centers. The monthly report shall compare the budgeted amount, the amount spent and comparison of the amount spent and budget on a year-to-year basis.

5. The Co-Executrices are authorized to continue to use Payche[x] in order to handle the payroll of the daycare centers.

---

[1] *See infra* note 14.

6. That the Court will reserve the specifications as to the type of organization to be utilized for the purposes of running the daycare centers pending recommendations by A.C. Hooper which shall be provided to the Court and to all the heirs.[2]

\*                                    \*                                    \*

8. That the Co-Executrices are authorized to have all of the real estate appraised.

A second "Order Authorizing the Continuation of Business" was signed by the court on April 29, 2002.[3] This Order effectively confirms the March 19, 2002 Order, *supra*, and gives the following additional authority to the Co-Executrices:

2. That the Co-Executrices are authorized to employ A.C. Hooper to form four (4) Limited Liability Corporations (LLC) for the day care centers and to transfer assets, subject to debts of the decedent, into the LLC's. A.C. Hooper is authorized to work to effectuate this structure and to transfer the assets.[4]

On May 31, 2002, the last day of the claim filing period, the Attorney General ("AG") filed a Claim against the Estate to recover "Assets of a Public Benefit Nonprofit Corporation...Children's Palace Learning Academy, Inc." The "Notice of Appearance and Nature of Claim" filed with the AG's $10,536,403.52 Claim reads, in pertinent part, as follows:

2. This nonprofit corporation apparently operated the four (4) daycare centers that are currently administered by this Estate and received money from the State of Tennessee using a Federal

---

[2] A.C. Hooper provided the court with a "Choice of Entity Report," which was filed on April 22, 2002. This report outlines the various options for choice of business entity, and the pros and cons of each.

[3] A third Order Authorizing the Continuation of Business was signed by the court on June 4, 2002. This Order confirms the March 19, 2002 and April 29, 2002 Orders. On June 17, 2002, an "Amended Order Authorizing Continuation of Business" was signed by the court. This Amended Order reset the hearing to September 10, 2002 and authorized the Co-Executrices to "reimburse A.C. Hooper for his out of pocket expenses to date, in the amount of $1,261.55."

[4] On December 19, 2000, the Secretary of State received Articles of Organization (Limited Liability Company) for "Children's Learning Palace, LLC" for the daycare located at the EP Property. On April 30, 2002, an "Articles of Amendment to the Limited Liability Company" was filed with the Secretary, which changed the name of this LLC from "Children's Learning Palace, LLC" to "Children's Palace Learning Academy #1, LLC." On April 30, 2002, an Articles of Organization Limited Liability Company was received by the Secretary for "Children's Palace learning Academy #2, LLC" located at 831 N. Thomas in Memphis. Also on April 30, 2002, the Secretary received Articles of Organization Limited Liability Company for "Children's palace Learning Academy #3, LLC" at 2451 Summer Avenue in Memphis and for "Children's Palace Learning Academy #4, LLC" located at 657 Chelsea Avenue in Memphis.

Employer Identification Number (EIN) 62-1558762 from approximately May 9, 1994, until the present...

\* \* \*

4. It appears that some assets of this Estate may be assets of the nonprofit corporation. These assets may include the retained earnings of the corporation (essentially funds received from the Department of Human Services less expenses), the going concern business value of the daycare centers, and any personalty or realty of the corporation.

On June 3, 2002, the Estate filed a "Petition for Temporary Restraining Order and Temporary Injunction" against the AG. The AG's investigation had been proceeding pursuant to civil investigative demand (CID) authority in Tenn. Code Ann. §8-6-401, *et seq.* The Estate's Petition was filed in an effort to halt the investigation. The Petition reads, in relevant part, as follows:

4. In connection with Respondent's CID, Respondent has scheduled depositions today, June 3, 2002, beginning at 1:00 p.m., for Petitioner, Joyce Ford-Miller and two (2) employees of Children's Palace, Katrina Watkins and Lucille Graham.

5. That since the Respondent has now instituted litigation in connection with this matter, the Tennessee Rules of Civil Procedure apply...

6. That it is the position of Petitioners that the litigation instituted by Respondent violates the statute of limitations as prescribed in T.C.A. 48-10-705(a) and T.C.A. 48-58-601(a). This action should have been brought within one (1) year from the date that the alleged allegation was discovered and no more tha[n] three (3) years after the alleged violation. The Respondent became aware of the alleged violation on October 18, 1996 pursuant to the provisions of T.C.A. 48-64-202(a) which specifically states that the Secretary of State "shall notify the Attorney General and Reporter in writing" upon determination of administrative dissolution of a non-profit corporation. A Notice of Determination was issued by the Secretary of State on October 18, 1996. On January 17, 1997, a Certificate of Administrative Diss[olution] was issued by the Secretary of State.

The trial court heard the Estate's Petition on June 3, 2002. After reading the State's CID into record, the trial court "assumed jurisdiction" over the AG's CID investigation and took "judicial notice of the fact that [the AG's CID issued to Joyce Ford-Miller for testimony and documents] is totally

unreasonable." On June 10, 2002, the trial court signed an "Order Granting Temporary Restraining Order," which reads, in relevant part, as follows:

> 1. That the Court has taken jurisdiction over the assets of Dr. James W. Ford, including the day care centers of Dr. Ford operated in the name of Children's Palace Learning Academy #1, #2, #3, and #4, and that these day care centers are being operated pursuant to orders of this Court.
>
> 2. That the Court takes Judicial Notice that the requests for documents filed by Respondent against...Joyce Ford-Miller as Executrix of the Estate of James W. Ford are unreasonable and burdensome.
>
> 3. That this Court hereby issues a Temporary Restraining Order against Respondent, Paul G. Summers, Attorney General and Reporter for the State of Tennessee from obtaining discovery from Joyce Ford-Miller in her fiduciary capacity only.

On June 14, 2002, the AG filed a Motion to Dismiss the Temporary Restraining Order and Temporary Injunction, which listed, as grounds for dismissal, the following:

> For grounds the Attorney General would show that, pursuant to Tenn. R. Civ. P. 12.02:
>
>> 1) pursuant to Rule 12.02(1), there is no in personam jurisdiction over the Attorney General, whose statutory residence is Nashville, not Memphis, and who is entitled to sovereign immunity;
>> 2) pursuant to Rule 12.02(2), there is no subject matter jurisdiction in this Court over the Attorney General's investigation into the disposition of the assets of Children's Palace Learning Center, Inc.;
>> 3) pursuant to Rule 12.02(3), the venue is improper, the Attorney General cannot be sued in this Court over his investigation into the disposition of the nonprofit assets of Children's Palace Learning Academy, Inc.;
>> 4) pursuant to Rule 12.02(4) and (5), there is an insufficiency of process and of service of process pursuant to Rule 4; indeed, no process issued to bring the Attorney General before this Court to challenge

his investigation into the disposition of the assets of Children's Palace Learning Center, Inc.;

5) pursuant to Rule 12.02(6), the petition fails to state a claim upon which relief can be granted, since there is no basis in law to enjoin the Attorney General's investigation into the disposition of the nonprofit assets of Children's Palace Learning Academy, Inc.

The Estate answered with its "Memorandum in Support of Petition for Temporary Injunction" on June 17, 2002. At a hearing on June 17, the matter was adjusted by agreement out of court and the temporary restraining order expired.

On June 17, 2002, the Estate filed a detailed Exception to the AG's Claim. The Exception reasserts the Estate's defense concerning the statute of limitations, *see* Estate's "Petition for Temporary Restraining Order and Temporary Injunction" *supra*. In addition, the Exception raises the following additional exceptions:

### b. The claim is barred because it is Res Judicata.

The Co-Executrices affirmatively plead the defense of res judicata. The Probate Court, having full knowledge of the status of Dr. Ford's administratively dissolved nonprofit corporation which was not funded or completed and of the limited liability corporation which was not funded or completed, recognized Dr. Ford's day care centers as sole proprietorships in its order of March 19, 2002 [the first "Order Authorizing the Continuation of Business"]. Under the Rules of Civil Procedure, an Order becomes final after thirty (30) days. The Attorney General had thirty (30) days to dispute this order. Even after thirty (30) days, the Rules allow correction of Orders if there is fraud or mistake. Nothing has been filed by the Attorney General's office to try to change this Court Order. The claim is barred because it is res judicata. The issue of whether there exists a nonprofit entity has already been decided by this Court and there is no nonprofit entity of Dr. Ford in existence.

### c. The claim is barred by Laches.

The Co-Executrices hereby affirmatively assert the defense of laches. The Attorney General had **actual** notice that the nonprofit entity known as "Children's Palace Learning Academy, Inc." was being administratively dissolved by the Secretary of State on **October 18, 1996**. The Attorney General then waits **seven (7)** years to bring any kind of action and further, **waits** until after the only person who

-7-

could answer any questions has died. It is inherently unfair and inequitable for the Attorney General to wait seven (7) years before it brings any kind of action. No other governmental agency, either state or federal, can wait this many years before giving any kind of notice of a claim. There has been no allegation of fraud against the decedent. The equitable defense of laches exists because of situations like this claim. You cannot wait seven (7) years, and then wait till the only person involved in any entity dies, to file any kind of claim or lawsuit. This claim should be barred by laches.

**d. This claim should be barred because it is an abuse of process.**

The Attorney General has chosen to selectively prosecute a claim against **this** decedent and **this** estate. The Co-Executrices would affirmatively state that the Attorney General's office is not filing claims against all corporations, profit or nonprofit, that filed a charter and were later administratively dissolved. Dr. Ford was a respected public figure. Why would the Attorney General's office wait seven (7) years before asserting a claim or even making any kind of inquiry whatsoever? Selective prosecution or enforcement is a violation of the Tennessee as well as the United States Constitution and it is an abuse of process. The claim of the Attorney General should be barred as an abuse of process.

**e. The Estate affirmatively denies that Children's Palace Learning Academy was ever a valid nonprofit corporation and the claim should be barred.**

The Co-Executrices would state that although Dr. Ford filed for a nonprofit charter and obtained an employee identification number, however, Dr. Ford **never** perfected a nonprofit status. Dr. Ford did not file for nonprofit status recognition with the federal or state government. Dr. Ford never received any advantages, tax or otherwise, because of the supposed nonprofit status.[5] Since operating the day care centers, Dr. Ford never filed as a nonprofit corporation and instead, filed his federal income taxes as a sole proprietorship. Dr. Ford did not receive any advantage or special treatment by the Department of Human Services because of any supposed nonprofit status.

---

[5] The record indicates that Ford's personal amended tax returns for the years 1994 through 1996 list business losses for CPLA.

Following the appointment of a Receiver over CPLA by the Chancery Court of Davidson County, *see infra*, the AG filed a "Motion to Amend Claim" in the Shelby County Probate Court, seeking to "substitute the court appointed Receiver for CPLA–David S. Weed–as the representative of CPLA on the claim." To date, the Receiver has not been made a party to this Claim.

On August 26, 2002, the Estate filed another "Petition for Temporary Restraining Order and Temporary Injunction" against the AG to enjoin the AG from exercising its powers under the Nonprofit Act. The Estate relied upon the March 19, 2002 Order, *supra*, for its contention that CPLA had no corporate existence and could not be sued in the Davidson County Chancery Court for appointment of a receiver since subject matter jurisdiction over corporate affairs had vested with the Shelby County Probate Court. The Estate's Motion was held in abeyance upon the Joint Order of September 10, 2002 entered by and between the Chancery Court of Davidson County and the Shelby County Probate Court, *see* discussion *infra* at Receiver and Davidson County Chancery Court section.

On September 6, 2002, the AG filed its "Response in Opposition to the Estate's Exception to the Claim." The AG's Claim was heard by the trial court on September 11th, 12th, 13th, 17th and 18th, 2002.

The record reveals the following pertinent facts:

1. **<u>Records of the Tennessee Secretary of State Regarding CPLA</u>**

On February 28, 1994, Ford, Vernita Gray Duncan ("Duncan"), and Stanley J. Blue ("Blue") signed the charter for CPLA as incorporators.[6] The Articles of Amendment to the Charter read, in relevant part, as follows:

> Pursuant to the provisions of Section 48-60-105 of the Tennessee Nonprofit Corporation Act, the undersigned corporation adopts the following articles of amendment to its charter:
>
> *                              *                              *
>
> 2.    The text of each amendment adopted is: ARTICLE II OBJECTIVES
>
> The purpose for which the Corporation is organized is exclusively religious, charitable, scientific, literary and educational within the meaning of section 501 (C)(3) of the Internal Revenue Code of 1986 or the corresponding provision of any future United States Internal Revenue law.

---

[6] *See* discussion of Duncan and Blue's association with Ford *infra* at Board of Directors Section.

*SEE ATTACHMENT I

\*                                    \*                                    \*

ATTACHMENT I

In the event of dissolution of the corporation, no incorporator shall be entitled to any distribution or its remaining property or its proceeds; and the balance of all money and other property received by the corporation from any source, after the payment of all debts and obligations of the corporation, shall be used or distributed exclusively for purposes within the intendment of Section 501 (C)(3) of the Internal Revenue Code as the same now exists or as it may be amended from time to time.

The By Laws of CPLA indicate that "[t]he PALACE shall maintain a non-profit status with terms to pursue objectives." On March 18, 1994, Ford and Blue signed a check made payable to the Secretary of State (the "Secretary"). Check number 105 was drawn on a corporate checking account held in the name of CPLA at Tri-State Bank. The amount was insufficient to pay the filing fee. On March 21, 1994, the Secretary stamped the date on the charter materials and returned them to CPLA with notice that the "correct privilege tax and filing fee have not been remitted." The Secretary requested another $40 and, on April 15, 1994, Ford and Blue signed check number 128 drawn on the CPLA Tri-State account. On April 19, 1994, the Secretary again stamped the charter materials with the date and filed the corporate charter.

On July 28, 1995, the "Corporation Annual Report" of CPLA was filed with the Secretary of State. The Report was signed by Ford as "Ch. of Board." The Report lists Stanley Blue as treasurer and Vernita Duncan as vice-president. The Report also indicates that Blue, Duncan and Ford comprise the board of directors of CPLA.

On October 18, 1996, the Secretary notified Ford that CPLA's 1996 Corporation Annual Report was overdue:

Pursuant to the provisions of Sections 48-24-201 or 48-25-301 of the Tennessee Business Corporation Act or Sections 48-64-201 or 48-65-301 of the Tennessee Nonprofit Corporation Act, it has been determined that the following ground(s) exist(s) for the administrative dissolution of the above corporation, if a Tennessee corporation, or the revocation of its certificate of authority, if a foreign corporation:

The Corporation Annual Report which was due on or before 8/01/96 has not been filed. To obtain an annual report form or for additional information, please call this office at (615) 741-4994.

If the corporation does not correct each ground for dissolution or revocation or provide evidence that each ground does not exist with two (2) months after effective receipt of this notice, the corporation and any associated assumed name(s) shall be administratively dissolved or may have its certificate of authority revoked, as appropriate...

On January 17, 1997, the Secretary issued a "Certificate of Administrative Dissolution" to CPLA "[f]or failure to file the Corporation Annual Report, as required by Chapter 16 of the Tennessee Business Corporation Act or the Tennessee Nonprofit Corporation Act."

## 2. **Department of Human Services Documentation Regarding CPLA**

The Tennessee Department of Human Services ("DHS") records for CPLA include a daycare operator's application with "Assurance of Compliance with Section 504 of the Rehabilitation Act of 1973, as Amended," which reads, in relevant part, as follows:

Pursuant to § 84.5(a) of the regulation [45 C.F.R. 84.5(a)], the recipient gives this Assurance in consideration of and for the purpose of obtaining any and all Federal grants, loans, contracts (except procurement contracts and contracts of insurance or guaranty), property, discounts, or other Federal financial assistance extended by the Department of Health and Human Services after the date of this Assurance, including payments or other assistance made after such date on applications for Federal financial assistance that were approved before such date. The recipient recognizes and agrees that such Federal financial assistance will be extended in reliance on the representations and agreements made in this Assurance and that the United States will have the right to enforce this Assurance through lawful means. This Assurance is binding on the recipient, its successors, transferees, and assignees, and the person or persons whose signatures appear below are authorized to sign this Assurance on behalf of the recipient.

This Assurance obligates the recipient for the period during which Federal assistance is extended to it by the Department of Health and Human Services or, where the assistance is in the form of real or personal property, for the period provided for in §84.5(b) of the regulation [45 C.F.R. 84.5(b)].

\*                                    \*                                    \*

Children's Palace Learning Academy      4404 Elvis Presley Blvd.

-11-



Name of Recipient (Type or Print)   Street Address or P.O. Box

62-1558762                           Memphis, T[N] 38116
(IRS) Employer Identification Number   City

\*                         \*                         \*

I certify that the above information is complete and correct to the best of my knowledge.

3/18/94          James W. Ford /S/ Chairman of Board
Date             Signature and Title of Authorized Official

In addition, the DHS documents include an "Assurance of Compliance with the Department of Health and Human Services Regulation under Title VI of the Civil Rights Act of 1964," which reads, in pertinent part, as follows:

> Children's Palace Learning Academy (hereinafter called the "Applicant")
>
> \*                         \*                         \*
>
> If any real property or structure thereon is provided or improved with the aid of Federal financial assistance extended to the Applicant by the Department, this Assurance shall obligate the Applicant, or in the case of any transfer of such property, any transferee, for the period during which the real property or structure is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. If any personal property is so provided, this Assurance shall obligate the Applicant for the period during which it retains ownership or possession of the property. In all other cases, this Assurance shall obligate the Applicant for the period during which the Federal financial assistance is extended to it by the Department.
>
> THIS ASSURANCE is given in consideration of and for the purpose of obtaining any and all Federal grants, loans, contracts, property, discounts or other Federal financial assistance extended after the date hereof to the Applicant by the Department, including installment payments after such date on account of applications for Federal financial assistance which were approved before such date. The Applicant recognizes and agrees that such Federal financial assistance

will be extended in reliance on the representations and agreements made in this Assurance, and that the United States shall have the right to seek judicial enforcement of this Assurance. This Assurance is binding on the Applicant, its successors, transferees, and assignees, and the person or persons whose signatures appear below are authorized to sign this assurance on behalf of the Applicant.

Date:<u>March 16, 1994</u>      <u>Children's Palace Learning Academy</u>
                                    Applicant (type or print)

                                 By:<u>James W. Ford /S/ Ch. of Board</u>
                                    Signature and Title of Authorized Official

Based upon these documents and the representations contained therein, CPLA received its license to operate a child care center and began to receive payments from the State of Tennessee.

## 3. **Board of Directors**

Vernita Gray Duncan is a physician who met Ford when she started working at the Memphis Health Center (where Ford was a staff physician) in 1983. She shared office space with Ford on two occasions, once in 1986 and again in 1995.

Duncan testified that, sometime in 1994, Ford approached her to serve as a board member for a daycare he was starting:

> Q. Were you [Duncan] ever approached by Dr. Ford to be involved in the creation of a daycare center?
>
> A. I was approached by Dr. Ford to serve as a board member for a daycare that he was planning to start.
>
> Q. ...Do you recall when that was approximately?
>
> A. It was about 1994.
>
> Q. How did he approach you about that? What did he ask you for, what did he ask of you?
>
> A. He stated that he was going to open a daycare or some daycares, he was going to open a daycare and he was forming a board, and he asked me would I serve, would I agree to serve.

-13-

Q. Did you agree to serve on the board?

A. I did agree, yes.

Stanley J. Blue worked for Ford from approximately 1986 until 1997. Concerning his duties and responsibilities while in Ford's employ, Blue testified as follows:

Q. How long of a period of time did you [Blue] work for Dr. James Ford?

A. Roughly from 1986 to around [97], after that I guess I did independent contracting with him. He would call me if he needed a favor or something like that. I was familiar with his office and the way things were done. After [97], I wasn't in his employment.

*                               *                               *

Q. In approximately 1994 until you left his employ, what were your duties and responsibilities for Dr. Ford?

A. Numerous, numerous responsibilities. Dr. Ford served in a lot of capacities. He was a pastor. He was on the city counsel. He was a general practitioner. He was an eye surgeon. He was a business owner. Because of that fact, a lot of responsibilities fell upon me, but primarily I was his office administrator at his medical practice.

Blue testified that Ford also approached him about being on the board for a daycare Ford was planning to open:

Q. Do you [Blue] recall in the beginning part of 1994 having a discussion with Dr. Ford about forming a daycare?

A. Briefly, yes.

Q. What happened when he first approached you about–

A. Pretty much a decision was already made that he was going to go into the daycare business.

Q. He told you that?

A. Yeah.

        \*                  \*                  \*

Q. Did he ask you to attend a meeting...?

A. Actually, the way that came about, I was actually on my way out the door one afternoon and saw a few people come in, and I turned around and asked him [Ford] what was going on, and he said, I meant to tell you that we are going to have a meeting. And it kind of upset me because it ran into my personal time, and I told him it would have been nice for you [Ford] to let me know. And he said it's not going to take long, basically going to have a brief meeting and introduce some people and that is it.

        \*                  \*                  \*

Q. What did you discuss at that meeting?

A. Nothing really. Dr. Ford mentioned that he was going to form a board and he wanted us to serve in some capacity. He said at that point he didn't really know, he was going to get back with us at a later date to advise us on what capacity he wanted us to serve in. Basically he wanted us to identify names with faces.[7]

## 4. CPLA Bank Accounts, Deposits from the State, and Checks made to "Cash"

      On or about March 10, 1994, account number 0198692 was opened at Tri-State Bank of Memphis in the name of "Children Palace Learning Academy." The signature card indicates that the account type is "Business Corporation," and that two (2) signatures are required for checks. Ford, Blue, and Duncan are listed as those authorized to sign checks drawn on this account. The back of the signature card reads as follows:

> I, <u>Stanley J. Blue</u> Title <u>Secretary</u> of the above styled organization hereby certify that the person(s) named above are duly elected and/or appointed to the offices indicated in accordance with our by-laws and/or articles of association and/or by a meeting of qualified members (a quorum being present): further certify that the signatures on the are genuine.
>
> DATE  <u>3/4/94</u>                    Signed  <u>Stanley J. Blue /S/</u>

---

[7] Blue testified that Duncan, Emmitt Ford (Ford's brother), Ford, and he were present at the meeting. However, neither Blue nor Duncan could recall the exact number that was present.

Address & Phone # of Signers:

(1) 655 E. Raines Rd. / Memphis 38104 388-7097
(2) 1977 Janis Ave. / Memphis 38116 388-4568
(3) 2053 Lyndgate / Memphis 38111 332-6992

UNDER THE PENALTIES OF PERJURY I CERTIFY THAT I HAVE SUPPLIED TRI-STATE BANK OF MEMPHIS THE PROPER TAX IDENTIFICATION NUMBER, AND THAT I (OR MY ORGANIZATION) IS NOT SUBJECT TO IRS-DIRECTED BACKUP WITHHOLDING OR THAT MY ORGANIZATION IS A[N] EXEMPT RECIPIENT UNDER THE INTERNAL REVENUE SERVICE REGULATIONS.

SOCIAL SECURITY # OR TAX IDENTIFICATION #[Redacted]

___ EXEMPT RECIPIENT        Signed __Stanley J. Blue /S/__

On May 30, 1994, Ford and Blue signed an "Authorization Agreement for Automatic Deposits (ACH Credits)" for the State of Tennessee, which authorized ACH deposits to be made into the Tri-State checking account. From May of 1994 until June of 1997, the State deposited some $3,167,668.80 into this account.[8] Of the checks in record for this account, there were some sixty-four (64) checks made payable to cash, during the years 1994 to 1997, for a total of $300,343.88.[9] In addition, in 1997, there were five (5) checks drawn on this account made payable to James W. Ford. The total amount of these five checks is $26,500.00. Concerning where this money went, Blue testified as follows:

Q. These checks, a lot of them in Exhibit 33 are made out to cash, it appears you [Blue] either signed on the front or you would sign on the back and get cash?

---

[8] There is some dispute in the record as to the exact amounts deposited into the CPLA account during this period of time. State's Exhibit 30B, which is the State's IRS Tape Report for CPLA, shows slightly different amounts than State's Exhibit 30A, which is a running list of deposits to the account. We rely on State's Exhibit 30A for the calculations in this opinion. In 1994, the deposits totaled $174,175.39. In 1995, the deposits totaled $637,999.63. In 1996, $1,807,699.90. And from January 1, 1997 until June 13, 1997, deposits totaled $547,794.06.

[9] There is some dispute in the record as to exactly how much money was drawn from the CPLA account on checks made to cash and how much was drawn from the account on checks made to Ford personally. From our review of State's Exhibit 13 and Exhibit 33, we calculate 13 checks to cash in 1994, totaling $46,121.40, 26 checks to cash in 1995, totaling $95,929.20, 13 checks to cash in 1996, totaling $73,543.28, and 12 checks to cash in 1997, totaling $84,750.

-16-

A. Correct.

Q. What did you do with that cash?

A. Presented it to Dr. Ford, it really wasn't that uncommon. I mean, at one point his [Ford's] credit was so bad that people were hesitant to take his checks, stuff like that.

Q. You [Blue] didn't get the cash?

A. No.

Q. You gave it to Dr. Ford?

A. Right.

In addition to the CPLA checks made to cash and to Ford personally, there are numerous checks made payable to Tri-State Bank without indication of their purpose.

On June 12, 1997, account number 050101265830 was opened at Boatmen's Bank in Memphis, Tennessee, in the name of "Children's Palace Learning Academy" and with the CPLA EIN number 62-1558762.[10] The "Commercial Signature Card" indicates that the type of ownership is "Corporation," and that there are two (2) signatures required for checks. There are four (4) authorized signers listed on the account: James W. Ford, Patricia Artry, Joyce Miller, and Joseph Ford. On June 24, 1997, Ford and Joseph Ford signed a second "Authorization Agreement for Automatic Deposits (ACH Credits)" for the State of Tennessee, which requested that the account for deposit of State funds be changed from the Tri-State account to the Boatmen's account. From June 16, 1997 until August 31, 2000, some $5,626,383.10 was deposited into the Boatmen's account.[11] Approximately $267,000.00 in checks drawn on this account were made payable to "Dr. James W. Ford."[12] Of these checks that contain a description of their purpose in the "For" section on the face of the check, the majority indicate that the check was either for rent or for "repayment of loan." There are no documents (i.e. promissory notes and/or leases) in this record to indicate that

---

[10] Although Boatmen's Bank has changed names, we will refer to this account as the "Boatmen's Account" for purposes of this Opinion.

[11] Again we rely on State's Exhibit 30A for this calculation. According to that Exhibit, in 1997 deposits to the account totaled $937,461.36. Deposits for 1998 totaled $1,887,023.80. Deposits for 1999 totaled $1,868,411.40, and, through August of 2000, deposits totaled $933,486.60. Exhibit 30A indicates that in September 2000 another $115,029.40 was paid from the State to CPLA; however, the Exhibit does not indicate the account into which these payments were made. Also, Exhibit 30A shows deposits totaling $42,478.90 made to account number 100248064, from August 16, 2000 through October 15, 1000. Although there are no bank documents concerning the set up or style of this account, records from the State indicate the account was held in CPLA's named under EIN number 62-1558762.

[12] We rely upon the "Gold Docs" for this calculation.

Ford loaned money to CPLA or that CPLA leased any real estate from Ford. In addition, there were at least two (2) checks totaling $50,000.00 drawn on this account and made payable to "Vector Medical Technologies" for medical supplies for Ford's private practice.

On April 7, 1999 account number 15000391, in the name of "Children's Palace Learning Academy," was opened at MemphisFirst Community Bank in Memphis, Tennessee. The EIN number listed on the account is 62-1558762. An "Authorization Agreement for Automatic Deposits (ACH Credits)" for the State of Tennessee was filed on September 18, 2000, and State deposits were made to this account from October 1, 2000 through August 15, 2001. Deposits to this account totaled $2,036,072.10.[13] Four (4) checks drawn on account number 15000391 were made payable to Dr. James W. Ford in the total amount of $62,040.00. One (1) check to cash in the amount of $4,000 was also drawn on this account.

A total amount of $10,843,808.68 was paid from the State to CPLA through August 15, 2002.[14]

## 5. **Real Property**

### (a) **4404 Elvis Presley Boulevard**

Vernon Sneed, one of the previous owners of property known as 4404 Elvis Presley Boulevard, Memphis, Tennessee ("EP Property"), testified that, around March, 1994, he met with two women and a realtor, whom he understood to be representing Ford, to discuss leasing the EP Property.[15] The EP Property, which had been a Pancho's Restaurant, was leased for two to three months and, during that time, Sneed testified that improvements were made to the property. On June 4, 1994, a Warranty Deed was executed for the EP Property. The Warranty Deed (Shelby County Register #EN2968) reads, in relevant part, as follows:

> THIS INDENTURE, made and entered into this 4th day of June, 1994, by and between ROWLETT WILSON SNEED, JR.,

---

[13] Exhibit 30A indicates that an additional $617,557.50 was paid from the State to CPLA from August 16, 2001 until January 15, 2002; however, the Exhibit does not indicate the account into which these payments were made.

[14] Although the record of deposits from the State ends at August 15, 2002, there is nothing to indicate that payments from the State have ceased to date. After Ford's death, an account was opened in the name of "Children's Palace Learning Academy, LLC" at MemphisFirst Community Bank in Memphis, TN. This account (#15004187) was set up in response to the probate court's entry of its "Order Authorizing Continuation of Business," which will be discussed *infra*. The balance of the $10,843,808.68 that has not been discussed *supra* was deposited into account 15004187 from January 16, 2001 through August 15, 2002. Records from the State indicate that an "Authorization Agreement for Automatic Deposits (ACH Credits)" for the State of Tennessee was filed to authorize ACH deposits to this account. A State email sent from Margaret Waynick to Brenda Brooks indicates that the request cannot be completed since the EIN number does not match CPLA's.

[15] A lease was originally discussed because, according to Sneed, "they [the two women] represented to [him that] they did not have capital to purchase the property."

AND WIFE, SARAH GAYE SNEED, RICHARD ARNOLD SNEED AND WIFE, ANNE T. SNEED, VERNON O SNEED, JR., TRUSTEE FOR THE V.O. SNEED-KATIE SNEED TRUST 1. VERNON O SNEED, JR., TRUSTEE FOR THE V.O. SNEED-KATIE SNEED TRUST 2 AND VERNON O. SNEED, JR., parties of the first part, and JOYCE F. MILLER, TRUSTEE, party of the second part.

           *                    *                    *

Property Owner and Address:
James W. Ford, M.D.

Memphis, TN 38117
Property Address
4404 Elvis Presley Blvd, Tn.  38116

Sneed testified concerning the terms of the sale and the source of payments as follows:

Q.  You and the other persons having interest in the real estate, did you enter into an installment sales contract with Dr. James Ford?

A.  Yes.

Q.  Can you describe the terms, as you recall, of that contract?

A.  The sale was one-third down.  The balance was to be paid in three or four lump payments.  I don't recall exactly, but it was not a monthly term payment note.  They would make one payment, three months later another payment, three months, and finish out within one year.  It was just a one-year note.

Q.  Did Dr. Ford pay as agreed?

A.  Yeah, he got it there.  As you see, I made a note on there , final payment was 9-5 of '95, which was a couple of months late.

*                    *                    *

Q.  Mr. Sneed, did you receive the full purchase price from Dr. Ford eventually?

A.  Yes, we did.

-19-

Q. Did you receive as payment checks from Dr. Ford on a company account?

A. I could not tell you what [sic] they came from, no.

Q. Did you receive as payment money orders from Dr. Ford?

A. He [Ford] had an individual who was supposedly his office manager that would bring us checks, and it seemed like there was a money order involved somewhere or maybe one of the cashier's check, but I didn't see any endorsements on the cashier's checks...

Concerning improvements made to the EP Property and the source of payment for those improvements, Sneed testified, in relevant part, as follows:

Q. You [Sneed] saw quite a bit of improvement actually made in the interior of that building, did you not?

A. There was a lot of improvement, interior and exterior.

*                          *                          *

Q. You [Sneed] don't have any idea for the cost?

A. None at all.

Q. But you know from what you had seen before you sold it or afterwards that quite a bit of money went into getting the property together; wouldn't you say that?

A. Again, quite a bit of money is different–

Q. Several thousands of dollars?

A. Several thousands, sure.

The total purchase price for the EP Property was $175,000.00. The total cost of renovations is not in record. Sneed testified that, in June 1994, he received $58,333.00, which represented one-third of the purchase price, and that the subsequent payments were made until the total purchase price was fully paid in 1995. Sneed did not recall how, or from what source(s), the

payments were made. The record does not contain any documentation concerning the down payment or installment payments on the EP Property, nor does it contain any itemization of the repairs made to the facility or the cost thereof.[16]

### (b) 657 Chelsea Property[17]

On or about January 5, 1996, Chism Trail, Inc. sold property known as 657 Chelsea. The Warranty Deed (Shelby County Register's #FP8239) indicates that the Owner of the property is James W. Ford. Tommy Chism, the Vice-President of Chism Trail, Inc. testified that he and Ford were involved in the negotiations for the purchase of this property. Although the original purchase price was $200,000.00, because of vandalism, the final selling price, as indicated on the Settlement Statement (State's Exhibit 27), was $85,000.00. Concerning the financing of the property, Mr. Chism testified as follows:

> Q. Did you [Chism Trail, Inc.] finance a portion of the sales price? How exactly were you paid?
>
> A. I think we were paid every three months until he [Ford] paid it off.
>
> Q. Do you recall the amounts he would pay? Was this a written installment contract at all?
>
> A. I don't know how much it was.
>
> Q. Do you recall how Dr. Ford made payments to you?
>
> A. By check.
>
> Q. Did he [Ford] use a personal check or a company check, do you know?
>
> A. I believe it was a company check.

CPLA check #325, dated May 13, 1996, is drawn on the Tri-State Bank account in the amount of $21,600.00. On the "For" line this check reads "cc # Chism Trail Inc." Concerning receipt of a cashier's check from CPLA, Mr. Chism testified as follows:

---

[16] The Shelby County Assessor's 2001 Appraisal of the EP Property was $406,200.00. A separate appraisal by William T. Chandler of Chandler and Chandler Real Estate (conducted pursuant to the request of the Co-Executrices under the auspices of the trial court's Order Authorizing the Continuation of Business, *see infra*) shows the EP Property value as $275,000.00.

[17] The Shelby County Assessor's 2001 appraisal of this property was $657,400.00. The Chandler appraisal of this property is $325,000.00.

-21-

Q. This cashier's check, what is the date on the cashier's check?

A. May 13, 1996.

Q. What is the amount of the check?

A. Twenty-one thousand six hundred.

Q. Does the cashier's check show the remitter?

A. Children's Palace.

Q. Is this a check you received as partial payment for the transaction at 657 Chelsea?

A. To my knowledge, yes.

Q. You testified earlier that your recollection is that the payments came from a business, they were from a business account rather than Dr. Ford personally?

A. I don't remember his personal account. I remember they were from Children's Palace.

Q. It was from Children's Palace's account rather than Dr. Ford for 657 Chelsea?

A. Yes.

In addition, there are two (2) checks drawn on CPLA's account in the total amount of $50,308.00 made payable to "D.B.E. Construction" and referencing the Chelsea property.[18] There are also fifteen (15) checks drawn on CPLA's account in the total amount of $109,600.00 made payable to "Alex Howard" and referencing work done to the Chelsea property.[19] There are two

___

[18] CPLA check #1828 dated July 3, 1996 in the amount of $25,308.00 and CPLA check # 1833 dated July 23, 1996 in the amount of $25,000.00. Both checks are drawn on the CPLA's Tri-State Bank account.

[19] Check #1845 dated August 9, 1996 in the amount of $25,000, check #1915 dated October 15, 1996 in the amount of $10,000, check #1938 dated November 1, 1996 in the amount of $10,000, check #1946 dated November 15, 1996 in the amount of $5,000, check #1965 dated October 5, 1996 in the amount of $10,000, check #1953 dated December 31, 1996 in the amount of $10,000, check #1978 dated January 21, 1997 in the amount of $400, check #1992 dated January 16, 1997 in the amount of $3,200, check #2001 dated January 23, 1997 in the amount of $400, check #2008 dated January 29, 1997 in the amount of $10,000, check #2010 dated January 29, 1997 in the amount of $600, check #2021 dated February 14, 1997 in the amount of $5,000, check #2047 dated February 21, 1997 in the amount of

(continued...)

checks totaling $6,500.00 for paving services at the Chelsea property.[20] There are two (2) checks made payable to "Construction Unlimited" in the total amount of $18,540.00 referencing work to the Chelsea property.[21] CPLA check #2100, dated April 11, 1997, is made payable to "Tony Hastings" in the amount of $1,000.00 and is for "Floors on Chelsea." CPLA check #2087, dated May 7, 1997, in the amount of $1,055.00 is made payable to "Craigen and Sons Cabinet" for "DP on Cabinets." CPLA check #2147, dated May 28, 1997, is made payable to Craigen and Sons in the amount of $2,274.60 for "657 Chelsea/Cabinets." CPLA check #1870, dated September 16, 1996, in the amount of $10,000.00 is made payable to "Richardson Heating Air Cond. Co."and is for "Partial Payment Air Chelsea." CPLA check #1995, dated January 16, 1997, is made payable to "Johnnie Richardson" in the amount of $5,500.00 for "Air/heat 657 Chelsea." CPLA check #2038, dated April 10, 1997, in the amount of $3,000.00 is made payable to "Memphis Roofing." CPLA #1198, dated June 11, 1996, in the amount of $5,270.00 is made payable to "Ms. Janice Jones" for "Roofing 657 Chelsea." CPLA check #2116, dated April 17, 1997, in the amount of $4,400.00 is made payable to "Charles Kirkwood" for "Final Payment on Carpet." In addition, there are two (2) checks in the total amount of $9,900.00 made payable to landscaping companies.[22]

### (c) 3673 S. Third Property

In May of 1999, Chism Trail, Inc. sold property located at 3673 South Third Street in Memphis, Tennessee. The Warranty Deed of May 17, 1999 (Shelby County Register's #JK3672) indicates that James Ford is the owner of that property. According to the Settlement Statement (State's Exhibit 29), the sales price of this property was $335,000.00. Concerning this transaction, Mr. Chism testified, in relevant part, as follows:

> Q. Can you [Mr. Chism] describe the manner in which Dr. Ford contracted to pay Chism Trail for the property at 3673 Third.

---

[19] (...continued)
$10,000, check #2078 dated March 21, 1997 in the amount of $5,000, and check #2086 dated March 28, 1997 in the amount of $5,000. All of these checks were drawn on CPLA's Tri-State Bank account.

[20] These are CPLA check #1119 dated February 13, 1996 in the amount of $3,250 and check #1131 dated February 13, 1996 in the amount of $3,250. We cannot read the full name of the payee on the photocopy submitted into evidence. The portion we can decipher reads "Mr. Howard S...." These checks are drawn on CPLA's Tri-State Bank account

[21] Check #1144 dated March 1, 1996 in the amount of $4,875 and check #1183 dated April 30, 1996 in the amount of $13.665 are both drawn on CPLA's Tri-State Bank account.

[22] CPLA check #3623 dated November 13, 1998 in the amount of $450 indicates that it is for "landscaping." We cannot read the name of the payee on the photocopy of the check admitted into evidence. CPLA check #3170 dated November 17, 1997 in the amount of $9,500 is made payable to "Foster's Landscaping Co."

A. I believe he [Ford] made a hundred-thousand-dollar downpayment. First of all, he put up fifteen thousand dollars earnest, I can remember that, and a hundred thousand dollars downpayment.

CPLA check #3519 dated August 19, 1999 in the amount of $100,000.00 is made payable to Chism Trail for "2nd property." There are an addition five (5) CPLA checks in record that are made payable to Chism Trail in the total amount of $88,000.00.[23]

### (d) 2451 Summer Property[24]

State's Exhibit 12, a "Counterpart Warranty Deed" (Shelby County Register's #HP8737) is dated June 22, 1998. The Deed indicates that James Ford is the owner of property located at 2451 Summer Avenue in Memphis, Tennessee. State's Exhibit 35H contains three checks drawn on CPLA's Boatmen's Bank account: Check #3239, dated January 14, 1998, in the amount of $30,000.00 is made payable to "Handel R. Durham, Jr." for "partial payment on Summer property;" check #3316, dated March 25, 1998, in the amount of $72,666.00 is made payable to "Chambers and Durham" for "2451 Summer Ave.;" check #3364, dated April 22, 1998, in the amount of $56,333.00 is made payable to "Handel Durham, Escro [sic]" for "2451 Summer."

### (e) 831 North Thomas Property[25]

State's Exhibit 36 is a Warranty Deed (Shelby County Register's #HP7958) conveying property known as 831 North Thomas Street, Memphis, Tennessee from "Elkins and Jay Investment, a South Carolina General Partnership composed of Samuel M. Elkins and David B. Jay" to "James W. Ford." State's Exhibit 35I contains three (3) checks each made payable to "Chambers and Durham" in the total amount of $181,200.00.[26]

## 6. Stocks

### (a) Pershing

---

[23] CPLA check #3695 dated January 10, 2000 in the amount of $30,000, CPLA check #3724 dated February 8, 2000 in the amount of $30,000 for "partial payment," CPLA check #3863 dated August 10, 2000 in the amount of $10,000 for "3673 3rd St.," CPLA check #3809 dated May 24th, 2000 in the amount of $8,000, and CPLA check #3864 dated July 11, 2000 in the amount of $10,000 for "3673 3rd St."

[24] The Shelby County Assessors's 2001 appraisal of this property was $234,000.00. The Chandler appraisal of this property is $225,000.00

[25] The Shelby County Assessor's 2001 appraisal of this property was $190,000.00. The Chandler appraisal of this property is $160,000.00

[26] CPLA check #3544 dated September 3, 1998 in the amount of $1,200 for "closing lot 831 N. Thomas," CPLA check # 3443 dated June 22, 1998 in the amount of $10,000.00 for "831 N. Thomas," and CPLA check # 3538 in the amount of $170,000 for "payment 831 N. Thomas."

Lee Andrew Jackson is a certified financial planner with Jackson Financial Center.[27] State's Exhibit 31 is a New Account Form, which indicates that an account with Jackson's company was opened in the name of James W. Ford on January 23, 1996. Ford was assigned Account number 3DH-090408 under his own social security number. Exhibit 31 shows numerous stock buys for account 3DH-090408 in Ford's name personally. Mr. Jackson testified concerning these transactions as follows:

> Q. When you [Mr. Jackson] had your dealings with him [Ford], how did he buy stocks? Describe for me a normal transaction for him.
>
> A. He [Ford] would call by phone, identify the stock he was interested in, and we probably discussed it a little bit, and he would give me an order to buy X number of shares of that stock for him.
>
> Q. How did he [Ford] pay for it?
>
> A. Generally by check.

Exhibit 31 contains three (3) checks that were used for the purchase of stocks in Ford's name personally. The total amount of these three (3) checks is $145,985.69.[28]

### (b) MemphisFirst

In April 1998, Ford signed a "Subscription Agreement" with MemphisFirst Corporation for 1,000 shares of stock. Ford subscribed as an "Individual" and the stock certificate (State's Exhibit 7) is in Ford's name personally. Two (2) CPLA checks totaling $190,000.00 were used to purchases MemphisFirst stock.[29]

## 7. Other Property

### (a) Antiques

Paul Michael Willis is the owner of Unique Antiques and Auction Gallery in Collierville,

---

[27] According to Mr. Jackson, Jackson Financial Center's broker dealer is Transamerica Financial. As their broker dealer, Transamerica Financial transmits Jackson Financial Center's securities transactions through Jackson Financial Center's clearing agent, which is Pershing.

[28] All of these checks are made payable to Pershing, Inc. CPLA check #3720 dated January 21, 1999 in the amount of $80,539.48 references Ford's account #3DH-090408. CPLA check # 3793 dated March 19, 1999 in the amount of $38,395.68 is for "3DH-090408." CPLA check # 3877 in the amount of $37,050.53 is also for "3DH-090408."

[29] CPLA check #3733 in the amount of $140,000 and CPLA check # 3180 in the amount of $50,000.

Tennessee ("Unique Antiques"). Mr. Willis testified that Ford began coming to the business sometime in 1998 and that, from that point, Ford was a fairly regular customer both in the showroom and at various auctions. Unique Antiques also handled the auction for the Ford Estate. Concerning Ford's purchases, the source of payment for these purchases, and the disposition of the property at the auction held for Ford Estate, State's Exhibit 22, the business records of Unique Antiques and Auction Gallery, evidence the following:

1. On January 17, 1999, Ford attended an estate auction held by Unique Antiques. At that auction, Ford purchased several items, including: (a) stained glass window for $2,500, (b) two (2) bronze sconces for $800, (c) a dining room suite for $7,750, (d) a bronze girl for $300, (e) a marble top console for $850, (f) a pair of 18' long iron gates for $4,000, and (g) a pair of 14' x 9' iron gates for $3,250.[30] According to Mr. Willis's testimony, all of these items were delivered to Ford's home at 655 E. Raines Rd. in Memphis, TN. CPLA check #3710 dated January 17, 1999 in the amount of $21,505.00 was used to purchase the above items. Concerning the disposition of this property, Mr. Willis testified, in relevant part, as follows:

> THE WITNESS [Mr. Willis]: ...The very first item was a stained glass window.
>
> BY MR. GARVEY:
>
> Q. Was that sold in the estate [of Ford]?
>
> A. No, it is still in the house [655 E. Raines Rd.].
>
> Q. How about lot number 10-14 [2 bronze sconces]?
>
> A. That item, the bronze sconces are still in the house.
>
> *                     *                   *
>
> Q. How about item lot number 421, 422, 423 and 424 [dining room suite].
>
> A. This item is a dining room suite that I [Willis] sold for him [Ford] in another auction. I have the paperwork here, too.
>
> *                     *                   *
>
> A. Okay, but it [the dining room suite] wasn't involved in the [Estate] sale at all.

---

[30] All of the items purchased from Unique Antiques, and described in this section, were purchases with Fellowship COGIC's tax exempt number.

-26-

Q. Did he [Ford] purchase this [dining room] suite at that auction?

A. Yes, he bought this dining room suite at the auction.

Q. Was it sold at the estate sale?

A. No.

Q. Is it still in the house?

A. No.

Q. Do you know where it is?

A. Yeah, I sold it maybe a year later for Dr. Ford...

*                          *                          *

A. The next page it just says a bronze girl. I have no idea [if it was sold at the estate auction]. There was [sic] all kind of small bronzes in the house. I can't remember that particular one.

In addition to the above items, Willis testified that the marble-top console and both pair of iron gates were sold at the Estate auction.

2. On January 18, 1999, Ford purchased a fox and hound hunter bronze from Unique Antiques. CPLA check #3717, dated January 18, 1999, in the amount of $625.00 was used to purchase this item. Mr. Willis testified that this item was sold as part of Ford's Estate.

3. On December 11, 1999, Ford purchased the following items from Unique Antiques: (a) two (2) large cut class vases, (b) two (2) marble and gilt pedestals, (c) an oriental "jard." and pedestal, and (d) two (2) cut glass tapered vases. Mr. Willis testified, and the Unique Antiques invoice notes, that these items were delivered to Ford's home at 655 Raines Rd. CPLA check #3672, dated December 17, 1999, in the amount of $2,425.00 was used to purchase these items. Mr. Willis testified that some of these items were sold as part of Ford's Estate and that some items, such as the marble and gilt pedestals were "pulled from the estate" because they were "property of some of the heirs of the estate."

4. On February 5, 2000, Ford purchased two (2) marble-top tables and a Venetian mirror from Unique Antiques. CPLA check #3722, dated February 22, 2000, in the amount of $2,500.00 was used to purchase these items. Although pictured in the Estate auction brochure, Mr. Willis testified that the Venetian mirror was pulled from the sale. Concerning the marble-top tables, Mr. Willis

-27-

testified that there were "quite a few of those type tables in the sale," but that he could not be sure that these particular ones were sold at the auction.

### (b) Oriental Rugs

Sarkis V. Kish is self-employed in the oriental rug business. Mr. Kish's business records (State's Exhibit 24) evidence the following:

1. On January 14, 1998, Ford purchased a Chinese rug from Mr. Kish (Kish Invoice #4819).[31] CPLA check #3240, dated January 14, 1998, in the amount of $950.00 was used to purchase this rug. Mr. Kish identified this Chinese rug as one of the items pictured in the Estate auction brochure.

2. On February 28, 1998, Ford purchased the following rugs from Mr. Kish (Kish Invoice #4840): (a) two (2) Romanian Serapi rugs, (b) two (2) Ramanian Gulshar rugs, and (c) a Chinese 80 line rug. CPLA check #3284, dated February 28, 1998, in the amount of $6,500 was used to purchase these rugs. Mr. Kish testified, and the invoice notes, that these items were delivered to the Ford home on Raines Rd. Mr. Kish identified at least one of the Romanian rugs as an item sold at the Estate auction.

3. On March 19, 1998, Ford purchased a Romanian rug and an Indian rug from Mr. Kish (Kish Invoice #004). These items were paid for with CPLA check # 3308, dated March 19, 1998, in the amount of $1,545.00.

4. On December 28, 1998, Ford purchased two (2) additional Indian rugs from Mr. Kish (Kish Invoice #384). These rugs were paid for with CPLA check # 3670, dated December 28, 1998, in the amount of $1,800.00.

Mr. Kish identified at least four (4) of these rugs as items pictured in the Estate auction brochure.[32]

## 8. Receiver and Davidson County Chancery Court Case

On August 16, 2002, the Attorney General for the State of Tennessee filed a Complaint against Children's Palace Learning Academy, Inc. in the Chancery Court of Davidson County. The Complaint alleges grounds for judicial dissolution, primarily misappropriation and waste of nonprofit assets, and seeks appointment of a receiver.

On August 20, 2002, the Attorney General filed a "Motion for Appointment of a Receiver." A "Receiver Order," appointing David Weed ("Receiver") receiver over CPLA was filed on August

---

[31] Ford also used Fellowship COGIC's tax exempt number to purchase all of the rugs discussed in this section.

[32] In addition to the antiques and rugs discussed in this section, there is evidence in the record to suggest that Ford also purchased appliances and electronics from McDuff with CPLA monies.

20, 2002 but this Order was held in abeyance pursuant to a joint order of the Davidson County Chancery Court and the Shelby County Probate Court entered on September 10, 2002. On February 3, 2002, an Order was entered vacating the joint order holding in abeyance.

CPLA never filed an Answer to the Attorney General's claim.[33] On September 26, 2003, the Davidson County Chancery Court entered its "Final Order of Default Judgment, and Decree of Dissolution," which reads, in pertinent part, as follows:

> This cause was set on the docket for a hearing of plaintiff's "Motion for Default Judgment" against defendant Children's Palace Learning Academy (CPLA), a nonprofit, public benefit corporation.
>
> This Court FINDS and CONCLUDES as follows:
>
> No response to this motion was filed by the corporation pursuant to Local Rule §26.04(c). However, on September 17, 2003, the Estate of James W. Ford, M.D. filed with the Western Section Court of Appeals a "Motion for Review and Stay of All Proceedings in Davidson County Chancery Court Relating to Children's Palace Learning Academy." That motion was denied by the court of appeals on the day it was filed.
>
> This Court has in personam jurisdiction over this corporation. This Court has jurisdiction over the subject matter of this lawsuit pursuant to provisions of the Tennessee Nonprofit Corporation Act, particularly Tenn. Code Ann. §§48-64-301(a) (subject matter jurisdiction) and 302(a) (venue).
>
> This public benefit corporation must be judicially dissolved pursuant to Tenn. Code Ann. §§48-64-301(a)(F) because it is no longer able to carry out its purposes, especially since it has no effective corporate governance. A receiver must be appointed pursuant to Tenn. Code Ann. §§48-64-303.
>
> Neither this Order nor the Receiver Order entered on August 20, 2002 is intended 1) to adjudicate the Claim filed by the Attorney General on behalf of the corporation and the public interest against the Estate of James W. Ford, M.D. to recover the purported corporate assets of CPLA, or 2) to interfere with the administration of those assets by the Probate Court of Shelby County.

---

[33] The Estate of Dr. James W. Ford, M.D. filed a Motion to Intervene on January 21, 2003. There is no order in the record to show that this Motion was granted.

ACCORDINGLY, IT IS ORDERED that the Attorney General's motion for default judgment is GRANTED. Defendant CPLA, a nonprofit public benefit corporation, is hereby judicially dissolved pursuant to Tenn. Code Ann. §48-64-304(a). Costs shall be taxed against defendant.

IT IS FURTHER ORDERED that David S. Weed shall remain as Receiver of CPLA pursuant to Tenn. Code Ann. §48-64-304(b). He shall have all those powers prescribed in the Receiver Order entered on August 20, 2002 and such other powers as this court directs and the law allows.

The Estate of James W. Ford, M.D. and the Estate of James W. Ford, M.D. d/b/a Children's Palace Learning Academy, Inc. ("Defendant-Appellant") appealed from this Order. Defendant-Appellant filed a Motion to Dismiss the Appeal, which was denied by this Court. Defendant-Appellant then filed a renewal of the motion to dismiss the appeal. In the alternative, Defendant-Appellant sought to file, in this case, its brief that was previously filed in the Shelby County Probate Court case. By Order of December 31, 2003, this Court allowed Defendant-Appellant to enter the same brief in both cases. The renewed motion to dismiss was considered by this court at oral argument. By Order filed on March 16, 2004, this Court dismissed the appeal from the Chancery Court of Davidson County.

The Shelby County Probate Court entered its "Memorandum Opinion and Order Pertaining to the Claim by the Attorney General on Behalf of Children's Palace Learning Academy, a Tennessee Nonprofit Corporation" (the "Final Order") on December 17, 2002. Because of the complex nature of this case, we reproduce the trial court's Findings of Fact and Conclusions of Law in their entirety below:

## FINDINGS OF FACT

The Court's findings of fact are as follows:

6. On February 28, 1994, James W. Ford, M.D., Vernita G. Duncan, M.D., and Stanley J. Blue executed the charter (Articles of Incorporation) of Children's Palace Learning Academy, which is part of Exhibit 1. Also as part of Exhibit 1 are the "Articles of Amendment to the Charter of Children's Palace Learning Academy," the "Bylaws," a "Nondiscriminatory Policy," and a paragraph requiring that in the event of dissolution all assets would go to a 501(c)(3) corporation. All of this was sent to the Secretary of State of the State of Tennessee and stamped received on March 21, 1994. It was all returned to the sender for insufficient funds, was resubmitted, and filed of public record April 19, 1994.

-30-

7. There is no indication in the record as to who prepared these documents or whether the preparers had professional help. The fact is that the charter, the amendment to the charter, bylaws, nondiscriminatory policy, and the paragraph relating to dissolution were filed with the Secretary of State.

8. On March 10, 1994 – after the date of execution of the charter on February 28, 1994 but before its initial receipt by the Secretary of State on March 21, 1994 – a bank account was opened at Tri-State Bank. This account is clearly designated as a business corporation account with the authorized signatories being James W. Ford, Stanley J. Blue, and Vernita Duncan. Mr. Blue signed the document that says James W. Ford, Stanley J. Blue and Vernita Duncan were the officers of the corporation, and that the corporation had the EIN (Employer Identification Number) of 62-1558762. Mr. Blue also signed a document styled "Supplemental Information on Depositor." All of these Tri-State account documents are part of Exhibit 5.

9. Neither party has brought to the Court's attention a copy of the SS-4, which is the application filed with the Internal Revenue Service to obtain an employer identification number (EIN). Such Form has blank boxes to be checked, identifying the type of business entity of the applicant.

10. There is no proof that any organizational meetings were held. The Court finds there were no organizational meetings as you normally find as such. There were no minutes of other meetings of directors in the record. There were no further corporate resolutions, other than to change or establish bank accounts; however, all checks introduced in evidence bore two signatures. Virtually all of them had the signature of James W. Ford and somebody else.

11. There was no application to the Internal Revenue Service for exempt status under the various subsections of 501(c) of the Internal Revenue Code. There was no application filed with the State of Tennessee for exemption from state sales taxes.

12. On June 12, 1997, an account was set up at Boatmen's Bank. There are two places for signatures authorizing the account. There is a line "for a corporation or unincorporated association." This is where the signatures appear. Opposite this line is a line to

sign for a proprietorship, but no signatures appear here. The Boatmen's account records are in Exhibit 3.

13. On March 18, 1994, three days before receipt by the Secretary of the initial charter, but after the signing of what was subsequently recorded as the initial charter, documents were prepared for the Tennessee Department of Health and Human Services. These documents were signed by Dr. James W. Ford, as Chairman of the Board of Children's Palace Learning Academy with the same EIN – 62-1558762. There was also signed on that date an "Assurance of Compliance" with Department of Health and Human Services regulations under Title VI of the Civil Rights Act of 1964, Children's Palace Learning Academy by James W. Ford, Chairman of the Board. This is Exhibit 2.

14. Commencing on May 17, 1994, Dr. Ford started leasing vehicles from Homer Bunker Leasing. This is Exhibit 21. The lessee is Children's Palace Learning Academy, signed by James W. Ford as Chairman of the Board. The initial lease is personally guaranteed by James W. Ford. In the initial lease, the guarantee says Children's Palace Learning Academy, Inc. There are several places that show Children's Palace Learning Academy, Inc., but the actual Articles of Incorporation of the nonprofit just had "Children's Palace Learning Academy."

15. According to the testimony of Lucille Graham, the daycare center began accepting children in May of 1994 and received its first funding from the State in June of 1994. Prior to June of 1994 and the receipt of state funds, the proof is clear that money was being spent from some source, *presumably* Dr. Ford, in order to pay people, in order to rehabilitate buildings, and in order to buy equipment, but there has been no direct proof as to the amount spent and the source of funds.

16. The evidence is absolutely overwhelming that Dr. Ford ran these businesses as if they were a proprietorship, running the business out of his back pocket. He paid for many personal items with Children's Palace checks. He bought furnishings for his home with Children's Palace checks, bought rugs with Children's Palace checks, paid for personal utilities with Children's Palace checks, and even bought liquor with Children's Palace checks. In instances involving the purchase of the furniture and rugs, the proof was, and the Court so finds, that Dr. Ford used the sales tax exemption number

of the Fellowship Church of God in Christ, the church at which he was a pastor, and therefore did not pay sales tax. That is not an issue before this Court – it is a question for the Department of Revenue – however, this illustrates the fact that Dr. Ford did what he wanted when he wanted and did not follow the procedures that most businesses follow, according to the experience of this Judge over the last forty some odd years.

17. On July 28, 1995, Children's Palace Learning Academy filed its one and only Annual Report, which is part of Exhibit 1. In that report, signed by James W. Ford as Chairman of the Board and dated July 28, 1995, Dr. Ford indicates that the officers listed in this report are one and the same as the directors. Those officers and directors are James W. Ford, Dr. Duncan and Mr. Blue.

18. The first daycare center location was on Elvis Presley Boulevard. Eventually more locations were opened, and the Court finds as indicated by the evidence that Children's Palace Learning Academy checks were utilized to pay for these pieces of real estate.

19. For whatever reason, Dr. Ford was not a prompt filer of his tax returns. Mr. Whitsy, his accountant from the early 1980's until 1997, testified that he had prepared personal form 1040 tax returns for Dr. Ford for calendar years 1994, 1995, and 1996. They were prepared and filed in June of 1997. There were no Schedule Cs attached to these returns for the daycare centers. Also, there were no 990's or other corporate tax returns filed on behalf of the daycare centers. Mr. Whitsy testified that it was only after preparing the personal returns that he learned something about the daycare centers. He prepared a rough draft of a document reflecting bank deposits and checks introduced as Exhibit 19. Mr. Whitsy told Dr. Ford what it would cost to prepare certain things on behalf of the daycares and their relationship terminated.

20. On October 18, 1996, the Secretary of State filed a notice regarding the fact that the corporation did not file its annual return for 1995. On January 17, 1997, there was entered a certificate of administrative dissolution. No action was taken by the Children's Palace and no action was taken by the Secretary. Under T.C.A. § 48-64-201, the Secretary may commence a proceeding under 48-64-202 to administratively dissolve a corporation if the corporation doesn't deliver its properly completed annual report to the Secretary within

two months after it is due, but this wasn't done in this case. By statute, the corporation can be administratively dissolved under 48-64-202 with notice to the Attorney General, and under that statute a corporation administratively dissolved continues its corporate existence but may not carry on any activities except those necessary to wind up and liquidate its assets and affairs under 48-64-106, to notify claimants under 48-64-107 and 48-64-108. That is what the law requires, but neither Dr. Ford nor the Attorney General paid any attention to the administrative dissolution statutes. The money just kept rolling in and being deposited to the corporate bank accounts from the State of Tennessee by direct deposit.

21. In December of 1997 after terminating Mr. Whitsy, Dr. Ford retained Sidney Goldstein for an IRS related collection matter, but not an audit. The collection matter issues apparently related to Dr. Ford's '93, '94, and '95 income tax payments. Mr. Goldstein's representation concluded in early 1999. Mr. Goldstein was subsequently retained to prepare Dr. Ford's 1997 Form 1040, and on February 18, 1999, Mr. Goldstein completed Dr. Ford's 1997 Form 1040, again, a couple of years late. Through all of this there was no disclosure to Mr. Goldstein of the Children's Palace daycare operations. He testified he didn't know anything about it, and somewhat later – he gives broad, broad dates of between April of 1999 and May of 2000 – he learned of the daycare centers.

22. The Court notes from observing Mr. Goldstein that he certainly exercised his duty of loyalty to his client both in his vagueness of the dates for a period of over a year and his advocacy for his client. In all probability, and the Court finds, that over a year elapsed before Dr. Ford advised Mr. Goldstein, his personal accountant, as to the daycare operations. That advice was only because of a problem with a Form 941 employment tax notice of deficiency. At that point, it was approximately May of 2000, that Mr. Goldstein prepared amended returns for the years '94, '95 and '96.

23. In May of 2000, Dr. Ford had not filed his tax returns for '98, '99, and 2000. The Court notes that there has still been no filing for '98, '99, and 2000, as well as 2001. There was testimony by Mr. Goldstein that most of the information on the 1040X's – the amended returns that he prepared for Dr. Ford – were based on information furnished to him by Dr. Ford, although he said in some instances there may have been some checks provided.

## CONCLUSIONS OF LAW

24. The issues are these: First, was Children's Palace Learning Academy a Tennessee not-for-profit corporation? Second, are CPLA's corporate assets included in the estate? Third, should the Court appoint a special master to determine the nature and extent of monies placed in CPLA's account by Dr. Ford and the monies paid to or for Dr. Ford from CPLA's account?

25. As for the first issue, there are factors for and against CPLA being a corporation. Against there being a corporation and in favor of there being a proprietorship, we have these facts: There were no minutes of an organizational meeting as required by law, no periodic minutes as required by law, no written minutes evidencing an initial board of directors – although there was on an annual report an indication of a board of directors, but there were no minutes expressly electing officers and directors. (The annual report seemed to nullify that.) There is the fact that Dr. Ford operated the business out of his back pocket like a proprietorship. There was no application to the Internal Revenue Service for any type of tax exempt status and no application for sales tax exemption.

26. On the other side of the coin, in favor of there being a corporation, there was a charter and bylaws labeled as bylaws. There was a corporate bank account. There was an application for State funds signed by Dr. Ford as Chairman of the Board. There was one annual report filed by the corporation. There were personal guarantees on vehicle leases that look like corporate leases. There were dual signatures on all checks. Mr. Blue – who served in many capacities including as business manager of Dr. Ford's medical practice – was familiar with the daycare centers because he drove the bus. Mr. Blue also knew about Dr. Ford's church. He says that for Dr. Ford's medical practice, only Dr. Ford signed checks, and that for Dr. Ford's church, only Dr. Ford signed checks. But the daycare business, all checks always required two signatures.

27. At the trial, it was said many times that Dr. Ford was a man who wore many hats. He was a doctor and a minister. He operated these daycare centers. He was on the City Council and on the County Commission. He was obviously a very, very bright person, but there was no evidence that he ever got any professional advice on how to operate a business. In fact, he didn't even disclose to his accountants what he was doing. He never filed his individual

tax returns on time, was very slow to tell his tax return preparers about this operation into which millions of dollars was going. He used the church tax exempt number for his personal benefit. He used monies from the daycare operations, rightfully or wrongly, for his personal benefit. He did not maintain typical business records.

28. As late as December of 2000, after a child died in a van and there was an issue of limiting liability, he forgot he had had this corporation. In his own mind he felt it wasn't a corporation, so he signed articles of organization for an LLC. There is no evidence of an operating agreement, and even at that late date, no assets were transferred to the LLC. A new EIN number was obtained. There were some attempts to change funding from the State to the new EIN, but there was no transfer of the assets of the four operating businesses to the LLC.

29. Looking at all of these factors, the Court concludes that Children's Palace Learning Academy was, in fact, a Tennessee not-for-profit corporation.

30. The real factors that tip the scales are that while there was a charter and the charter was recorded, there was at the same time a bank account established in the name of the corporation, apparently an EIN number on behalf of the corporation, and all of the monies were direct deposited by the State into that account, and that constitutes a funding of the corporation. We also had the fact that of all the businesses and matters that Dr. Ford was involved in, this one required two signatures.

31. There are also Dr. Ford's tax returns. Forms 1040 were prepared and filed for '94, '95 and '96, but with no Schedule C for the daycare centers.

32. In 1999, Sidney Goldstein learned about the daycare centers. The Court puts itself into Sidney Goldstein's shoes. You have a client that has received a whole lot of money in '94, '95, '96, '97, '98, and '99 – millions of dollars that have never been reported. The client tells you that he got a charter, but doesn't tell you about the corporate bank account. The proof is that Mr. Goldstein didn't know about the corporate bank account. What are you going to do? As an accountant or anybody who does tax work, you know that there are two different elements, two different governments to deal with on a nonprofit corporation. All corporate licenses come from the various

states. With a few exceptions, for all practical purposes, there are no federal corporations. It is incumbent upon you if you don't want to pay taxes to qualify with the federal government under certain of the provisions of Section 501(c). We heard a lot of talk about Section 501(c)(3), but there are subsection 501(c)(1) through (15) exemptions. Subsection 501(c)(3) pertains to corporations to which any of us can transfer money or assets and receive charitable deductions. A 501(c)(7) corporation, for example, pays no taxes, but contributions to it are not tax deductible. You have all these organizations that don't pay income tax. On the one hand, you have got to qualify as a nonprofit with the state. On the other hand, you have got to determine under what section of 501 you qualify so as to be a non-tax-paying entity.

33. In this case, Dr. Ford hired Mr. Goldstein, who is a smart accountant. He has a client in front of him who has received millions of dollars. No taxes have been paid. The client files returns, albeit late, he filed them, didn't include it, and the entity didn't file any returns. Now, if the entity, even though it's nonprofit by the State, is not qualified under 501 – should it not have filed some type of income tax return? It received income, and how can I help my client most, rather than going back and saying my client hasn't filed for six years? The point of least resistance is to file an amended Schedule C, and that is what Mr. Goldstein did. He filed an amended Schedule C to put his client in the best possible light, but Dr. Ford himself on the returns (as actually filed) never indicated that this was a proprietorship.

34. Mr. Goldstein did testify that he was not aware of the corporate bank account.

35. We had other testimony regarding whether or not it was a corporation. Danny Richardson, who is primarily a personal injury attorney for both plaintiffs and defendants, testified about lawsuits in which the daycare centers were involved. Mr. Quinlen, who attempted to set up the LLC that was never completed, was not aware of the bank account. A.C. Hooper's testimony was that if somebody asked him about the charter, "if you haven't funded it, no corporation." Nobody asked him anything further and that was the key. It had to be funded, it was funded.

36. The Court feels that the Attorney General has carried his burden of proof and that there is a corporation. My ruling is that it is

a nonprofit corporation. The business belongs to the nonprofit, including the tangible assets, streams of income from the State, the goodwill and things listed as business assets. What does not go with it is the real estate, the bank stock, and the other stock.

37. The next issue involves the Attorney General's position that the real estate, bank stock, and individual stocks are subject to a constructive trust. Since the Court does not believe that this property is subject to a constructive trust, a special master for further accounting is denied.

38. The proof is that Dr. Ford ran these businesses. He hired and fired. He bought, remodeled, and improved properties. He signed checks. There is no question that Dr. Ford advanced money, but how much we don't know. Virtually all of the funding – other than his advances – came from the State; however, there is no indication of the Department of Human Services auditing anything and this has been going on for years. People who run businesses, be they for profit or not-for-profit businesses, are entitled to compensation, and the Court finds that monies flowing to or for Dr. Ford were either repayments of loans or compensation.

39. The law in Tennessee is that a constructive trust cannot be imposed against a party who receives property in good faith and without notice of an adverse claim. A constructive trust may only be imposed against one who by fraud, action, duress or abuse of confidence, by commission of wrong or by any form of unconscionable conduct or by concealment or questionable means has obtained an interest in property he ought not in equity or good conscience retain.

40. The Court feels that Dr. Ford operated in good faith, that there was no notice of an adverse claim, and that the State has not carried its burden of proof. The Court can find no fraud or other means by which to impose a constructive trust. The Court holds that the real properties titled in Dr. Ford's name, the bank stock and the other stocks, as well as all furnishings, are properties of the Estate. Children's Palace Learning Academy is a Tennessee not-for-profit corporation subject to the statutes that govern not-for-profit corporations. The Court holds that the monies received by Dr. Ford from this corporation, to the extent there were loans or repayment of loans, and to the extent they are not loans, are income to Dr. Ford.

-38-

That is a matter between the Estate and the Internal Revenue Service. It is not subject to the jurisdiction of this Court.

41. The Court feels that the Estate's statute of limitations arguments should be overruled and are hereby overruled.

## **POSTSCRIPT**

42. Why did we end up here? There is no way of knowing. Dr. Ford was very busy. He wore many hats. He was also ill. He was a doctor. Maybe he knew he had a terminal illness and just said he was going to operate the businesses the way he wanted to operate them and forget about rules and regulations. We don't know. Maybe he was naive. We don't know, but he certainly never received professional advice. Since he didn't get the professional advice, it's now up to the Court to determine the issues brought before it.

43. As far as maintaining the supervision of this Court over CPLA, there is a joint order between Chancellor McCoy and this Court. The Court wants Chancellor McCoy to see what this Court has ruled and to know what is going on. Then she and I in a telephone conversation might be able to resolve this issue. In addition, the Court reserves the right to set fees and applicable fees to counsel and other fiduciaries out of daycare operations to the extent the services rendered relate to the daycare operations.

### **ACCORDINGLY, IT IS ORDERED that:**

1. The four daycare center businesses known as "Children's Palace Learning Academy" are the property of Children's Palace Learning Academy, a Tennessee nonprofit corporation; including the tangible assets, streams of income from the State, the goodwill, and the things listed as business assets.

2. The real estate, bank stock, individual stocks, and furnishings all paid for with CPLA checks are the property of the Estate.

3. There is no constructive trust and no requirement for an accounting by the Estate to the nonprofit corporation.

4. The Estate's statute of limitations arguments should be overruled and are hereby overruled.

Both the Estate and the AG filed timely Notices of Appeal and Motions for a Stay Pending Appeal. The AG's Motion was denied. The Estate's was granted.

## Issues

The Estate presents the following issues for review as stated in its brief:

> I. Whether the Probate Court erred in finding that a non-profit corporation exists contrary to the Non-Profit Corporations Act?
>
> II. Whether the lower court erred in granting a "Non-Profit Corporation" the business assets, streams of income and goodwill absent grounds for a constructive trust?
>
> III. Whether the Probate Court erred in failing to address and denying the statute of limitations defense under T.C.A. § 48-58-601(a)?

The AG raises the following additional issues as stated in its brief:

> I. It was error for the trial court to give the property of a nonprofit, public benefit corporation to the Estate when it had neither in personam jurisdiction over the corporation nor subject matter jurisdiction over its corporate assets, its affairs, or its existence.
>
> II. The trial court erred in using money generated by CPLA's nonprofit daycare business to pay professionals who represented the Estate against CPLA.
>
> III. The trial court incorrectly sealed the financial reports of the daycare business.

## Standard of Review

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Some of the issues in this case are purely questions of law. As such, we review those issues, upon the record, with no presumption of correctness. *See Finister v. Humbolt Gen. Hosp.*, 970 S.W.2d 435 (Tenn. 1998).

## Statute of Limitations

We will consider the Estate's third issue first. The Estate asserts that the probate court erred by not granting the statute of limitations defense under T.C.A. § 48-58-601(a). T.C.A. §48-58-601(a) is titled "Limitation of and immunity from actions for breach of fiduciary duty," and reads as follows:

> (a) Any action alleging breach of fiduciary duties by directors or officers, including alleged violations of the standards established in §48-58-301, §48-58-302 or §48-58-403, must be brought within one (1) year from the date of such breach or violation. In the event the alleged breach or violation is not discovered nor reasonably should have been discovered within that one-year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered. In no event shall any such action be brought more than three (3) years after the date on which the breach or violation occurred, except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after the alleged breach or violation is, or should have been, discovered.

The Estate relies upon this statute for their contention that the AG's suit to recover nonprofit assets should have been filed within one year (i.e. on or before October 18, 1997) of the Secretary's determination that CPLA had failed to file its 1996 Annual Report. We disagree.

It is a well settled principle of law that statutes of limitation, against the State as the sovereign, are looked upon with disfavor, and will not be enforced unless there is a clear and explicit authority therefor given by statute. *See, e.g., Anderson v. Security Mills*, 133 S.W.2d 478, 480 (Tenn. 1939). T.C.A. §48-58-601(a) does not specifically apply to the AG nor does it specifically apply to the recovery of nonprofit corporation assets for the public interest. The Claim is based in the law of property. Upon administrative dissolution, corporate property of a public benefit corporation does not become the property of the corporate directors or officers. *See Summers v. Cherokee Children's and Family Serv.*, 112 S.W.3d 486, 501 (Tenn. Ct. App. 2002).[34]

---

[34] In addition, ATTACHMENT I to the CPLA charter states:

> In the event of dissolution of the corporation, no incorporator shall be entitled to any distribution or its remaining property or its proceeds; and the balance of all money and other property received by the corporation from any source, after the payment of all debts and obligations of the corporation, shall be used or distributed exclusively for purposes within the intendment of Section 501 (C)(3) of the Internal Revenue Code as the same now exists or as it may be amended from time to time.

Furthermore, T.C.A. §48-51-701 of the Nonprofit Corporations Act, which is titled "Attorney general and reporter," provides that the power of the AG to enforce the Nonprofit Act cannot be waived or otherwise lost:

> (c)(4) The attorney general and reporter may decline to consider the request for consent, approval, or waiver, and inaction by the attorney general and reporter, within the statutory period of notice, or otherwise shall not be construed as consent to or approval of the act or transaction, or construed to waive, estop, or in any other way restrict the attorney general and reporter from exercising the attorney general and reporter's authority under chapters 51-68 of this title...

The AG's Claim against the Estate is not time barred and the trial court did not err in finding that the AG's claim is not barred by the statute of limitations.

**Non-Profit Corporation**

The Estate's first issue is whether the probate court erred in finding that a nonprofit corporation exists. The Estate contends that the trial court erred in finding that CPLA is a nonprofit public benefit corporation under the Nonprofit Corporations Act. From the entire record before us, we find that CPLA was a nonprofit public benefit corporation. There are at least three grounds for this conclusion:

**1) The evidence does not preponderate against the trial court's finding.**

The Estate contends that the trial court relied upon five "irrelevant and inappropriate facts" to find that a corporation exists. In fact, the trial court's Final Order indicates six factors upon which the finding was made:

> 30. The real factors that tip the scales are that while [I] there was a charter and the charter was recorded, [ii] there was at the same time a bank account established in the name of the corporation, [iii] apparently an EIN number on behalf of the corporation, [iv] and all of the monies were direct deposited by the State into that account, and that constitutes a funding of a corporation. [v] We also had the fact that all of the businesses and matters that Dr. Ford was involved in, this one required two signatures.
>
> 31. [vi] There are also Dr. Ford's tax returns. Forms 1040 were prepared and filed for '94, '95 and '96, but with no Schedule C for the daycare centers.

(numerals added).

The AG contends that the Secretary's certificate and the charter are conclusive by law. We agree. The facts are undisputed, and the Estate concedes, that CPLA filed a charter that was recorded by the Secretary. T.C.A. §48-52-103(a) states that "corporate existence begins when the charter is filed with the secretary of state." The probate court relies upon facts such as the opening of a corporate bank account, requiring two (2) signatures, EIN number, and tax returns; and, although these facts provide strong supporting evidence of corporate existence, the filing of the charter began the corporate existence under T.C.A.§48-52-103(a).

The fact that Ford controlled and used this corporation as if it were a sole proprietorship is also no proof that the corporation did not exist. Rather, Ford's action in running these daycares and his inaction in complying with the organizational requirements of the Nonprofit Act cannot, in the face of the filed charter, lead us to conclude that CPLA was a sole proprietorship. Rather, Ford's action/inaction lead only to the conclusion that this nonprofit public benefit corporation was properly administratively dissolved, *see* discussion *infra*. The evidence does not preponderate against the trial court's finding that CPLA is a nonprofit, public benefit corporation.

**2) There is no statutory default to a sole proprietorship upon administrative dissolution.**

It appears to this Court that the Estate is, in essence, arguing that Ford's control of these daycare facilities, his failure to completely comply with the Nonprofit Act in organizing, and the fact that the entity was administratively dissolved lead to a default or de facto sole proprietorship. No law to support the Estate's contentions has been supplied, nor have we found such authority. As noted above, a nonprofit corporation's existence begins upon the filing of the charter with the Secretary. None of the statutes addressing administrative dissolution contain any authority for the proposition that, upon such dissolution, a nonprofit corporation defaults to a sole proprietorship.

**3) The matter is res judicata.**

Upon dismissal of the appeal from Davidson County Chancery Court, the Order of that court dissolving CPLA and appointing a receiver to wind up its affairs became the final order and is ***res judicata*** on the issue of corporate existence.

The Estate's second issue and the AG's first and second issues are rephrased into the single issue of whether the probate court erred in its allocation of various properties between the State and CPLA and in authorizing the Estate to continue operation of the daycare centers.

**Continued Operation of CPLA**

As discussed, *supra*, the trial court authorized the continued operation of CPLA with several orders and amended orders authorizing the continuation of business beginning with the first on March 19, 2002. The court entered these orders under the assumption that CPLA was

a sole proprietorship. Having subsequently found that CPLA was a nonprofit public benefit corporation, the trial court should not have allowed the Estate to continue operation of these daycare facilities for several reasons:

**1) Lack of notice to the AG**

> T.C.A. §48-62-102(g) provides as follows:

>> A public benefit corporation must give written notice to the attorney general and reporter at least twenty (20) days before it sells, leases, exchanges or otherwise disposes of all, or substantially all, of its property in a transaction not in the usual and regular course of its activities unless the attorney general and reporter has given the corporation a written waiver of this subsection.

> The April 29, 2002 Order gave the Co-Executrices the authority to "employ A.C. Hooper to form four (4) Limited Liability Corporations (LLC) for the day care centers and to transfer assets, subject to debts of the decedent, into the LLC's." The transferring of CPLA assets to these four LLC without notice to the AG is in direct violation of T.C.A. §48-62-102(g).

**2) Licensing**

> From the record before us, it appears that the four LLCs authorized by the trial court's April 29, 2002 Order are operating under the CPLA licenses, which are nontransferable. Pursuant to the "Rules of Tennessee Department of Human Services Social Services Division" Rule 1240-4-3-.02, each CPLA location must have its own license and these respective licenses are "not transferable from one location to another or from one licensee/operator to another." In order to conduct business legally, each of these four LLCs must obtain its own license in its own name. This Court can find no authority under which the newly formed LLCs may operate under the licenses obtained in the name CPLA.

**3) Lack of jurisdiction.**

> Simply put, the Shelby County Probate Court has no authority over CPLA and that lack of authority extends to endeavors to liquidate assets belonging to CPLA, endeavors to restructure CPLA, endeavors to monitor or run the daycare centers, and endeavors to bar the AG and/or Receiver from pursuing a Claim against the Estate to recover assets of this nonprofit public benefit corporation, or to bar the AG/Receiver's access to any and all records pertaining to CPLA. As discussed in detail, *infra* at the Receiver section of this opinion, the Chancery Court of Davidson County is the court of proper jurisdiction and venue. *See* T.C.A. §§48-64-301 and 48-64-302. As such, the chancery court may take any "action required to preserve the corporate assets wherever located...." T.C.A. §48-64-302(c). In its "Receiver Order," the chancery court gave the Receiver specific authority to take over the running of CPLA. The probate court has no statutory authority to interfere with the Receiver's duties and authority under the chancery court's

order. Transferring the assets of CPLA to these four LLCs is in direct conflict with the Receiver's authority under the statute and with the Receiver's authority under the "Receiver Order," which was entered under statutory authority (*see infra* at Receiver section*).*

Furthermore, the Davidson County Chancery Court specified in its "Receiver Order" that the Receiver shall "[r]epresent the receivership entity, CPLA, in an effort to recover from the Estate of James W. Ford, MD any books, records, and assets of CPLA that may be included in the Estate." The "Receiver Order" further authorizes the Receiver to "[i]nstitute, prosecute, defend, compromise, intervene in, seek stays in, or become a party to, such suits, actions or proceedings at law or in equity as may in the receiver's opinion be necessary for the collection, recovery, protection, maintenance or preservation of the receivership properties." The Shelby County Probate Court has no authority to stop the Receiver from administering his duties under the "Receiver Order" of the Davidson County Chancery Court. This, coupled with the fact that claims in probate may be liberally amended, Tenn. R. Civ. P. 15; **see also Drinkard v. Jennings**, 582 S.W.2d 387 (Tenn. Ct. App. 1978), leads this Court to the conclusion that the probate court erred in declining to substitute or, at least, join David Weed, Receiver for CPLA, in the AG's Claim against the Estate.

On Appeal, the AG further asserts that the trial court incorrectly sealed the financial reports of the daycare business. Pursuant to the March 19, 2002 Order allowing for the continuation of business, quarterly financial reports, concerning the current operation of CPLA, have been filed with the probate court. At a hearing before the trial court on January 22, 2003, the following exchange occurred concerning these financial reports:

> What we [the AG's office] would like to have is that the receiver be free to represent the interests of the corporation in this Court pending the appeal and outcome thereof. We feel we have interests to protect given Your Honor's final order.
>
> What this would involve is we could try to predict is that the receiver could monitor the financial reports, that I understand are not filed with the clerk but kept in your office, that he could visit the facilities as he sees necessary to familiarize himself with the operation thereof, so he could in an unobtrusive way get a handle on the situation. And then he could speak with the people that were running the show and also just get a handle on things and to protect the interest of the corporation in the business of the daycare centers.
>
> *          *          *
>
> As it stands now, we have no way to monitor the business if we don't have access to the reports. We're not equipped certainly to operate the daycare center, and the receiver does have that experience,

not only longstanding experience as a receiver but also in daycare centers in other cases....

Following the Estate's rebuttal, the trial court made the following ruling:

> ...There is an issue as to whether or not to make, quote, public, end quote, as a matter of record all these financials. And frankly this judge has agonized over this and feels the disadvantages outweigh the advantages.

As a nonprofit, public benefit corporation that has been dissolved (*see infra* at Receiver section), the management of these daycare centers is now within the auspices of the Davidson County Chancery Court and its appointed Receiver. The probate court must immediately relinquish all control over these daycare facilities so that the Receiver may exercise his authority under the statutes and the "Receiver Order." Any and all documents that relate to the daycare centers of any kind whatsoever, regardless of when they came into existence are now the property of the Receiver pursuant to the "Receiver Order," which reads, in relevant part, that the Receiver is to "[t]ake exclusive custody, control and possession of all bank accounts, good, chattels, causes of action, credits, monies, effects books and records of account and other papers and property of interests owned or held by the receivership entity or placed under the control of the Receiver by order...."

To clarify, we hold that the probate court's orders allowing for the continuation of business under the direction of the Co-Executrices and the authority and supervision of the probate court are hereby reversed. These orders are in direct opposition to the statutory authority vested in the Receiver and authority granted to him by Order of the Davidson County Chancery Court. In addition, the probate court's effort to convert the structure of CPLA to an LLC is impractical insomuch as CPLA's licenses and properties may not be transferred to these new entities. We also find that the Receiver, pursuant to the authority given him by statute and by the Davidson County Chancery Court, should be substituted for, or joined with, the AG in its Claim against the Estate, and that he should, under that same authority, be given access to any and all records compiled on behalf of, or by, the daycare centers, both prior to and after the opening of the Estate. We remand for these purposes.

## Receiver

The Complaint filed by the AG in the Davidson County Chancery Court was, in effect, a cause of action for judicial dissolution of CPLA. As such, the chancery court was the court of proper jurisdiction and venue for this action. T.C.A. §48-64-302(a) provides:

> **Procedure for judicial dissolution.**–(a) Venue for a proceeding by the attorney general and reporter to dissolve a corporation lies in Davidson County...

-46-

Paragraph 33 of the AG's Davidson County Complaint alleges numerous grounds for dissolution of CPLA, including:

> a. It [CPLA] has allowed its nonprofit assets to be misappropriated and wasted;
> b. It is a public benefit corporation and is no longer able to carry out its purposes, in part because it has allowed its charter to be administratively dissolved, it lacks corporate governance, and it has lost control over its assets;
> c. It has exceeded or abused authority conferred upon it by law; and
> d. it may have otherwise violated the Nonprofit Act on legal and factual grounds presently unknown to or not fully developed by the Attorney General.[35]

The Davidson County Chancery Court entered a default judgment against CPLA for failure to answer, which "is in the nature of a confession that the complaint is true." *Gibson's Suits in Chancery* (7th ed. Inman) Sec. 141.

Taking the dissolution grounds asserted by the AG in its Complaint as true, we find that the Davidson County Chancery Court was correct in holding that CPLA, a public benefit corporation, "must be judicially dissolved pursuant to Tenn. Code Ann. §§48-64-301(a)(F) because it is no longer able to carry out its purposes...." Having properly dissolved the corporation, the chancery court was within its auspices to appoint David Weed as Receiver over CPLA. T.C.A. §48-64-303(a) specifically grants the Davidson County Chancery Court this authority:

> (a) A court of record having equity jurisdiction in a judicial proceeding brought to dissolve a corporation may appoint one (1) or more receivers to wind up and liquidate...the affairs of the corporation...

Concerning the powers and duties of the Receiver, T.C.A. §48-64-303 reads, in relevant part, as follows:

> (c) The court shall describe the powers and duties of the receiver...in its appointing order, which may be amended from time to time. Among other powers:
> (1) The receiver may:
>> (A) Dispose of all or any part of the assets of the corporation wherever located, at a public or private sale, if authorized by the court; and

---

[35] These grounds are specifically set out at T.C.A. §48-64-301.

(B) Sue and defend in the receiver's own name as receiver of the corporation in all courts of this state.

The "Receiver Order" entered by the Davidson County Chancery Court on August 20, 2002 specifically states that the Receiver shall take the following actions on behalf of CPLA:

I. Represent the receivership entity, CPLA, in an effort to recover from the Estate of James W. Ford, MD any books, records, and assets of CPLA that may be included in the Estate. This Order is not a finding or conclusion or order by this Court that any books, records, and assets of CPLA are included in the Estate;

ii. Take exclusive custody, control and possession of all bank accounts, goods, chattels, causes of action, credits, monies, effects, books and records of account and other papers and property or interests owned or held by the receivership entity or placed under the control of the Receiver by order, with full power to sue for, collect, receive and take possession of such receivership properties;

iii. Conserve, hold and manage all receivership properties in order to prevent loss, damage and injury to investors, creditors and others who have done business with receivership entity; to obtain an accounting thereof; and to adjust and protect the interests of such creditors and other persons doing business with receivership entity as approved by this Court;

iv. Forthwith contact all financial, agency, trust, or depository institutions maintaining accounts on behalf of the receivership entity and amend the signature cards so that only those persons approved by the receiver shall be permitted to draw upon such accounts;

v. Forthwith discontinue all payments by the receivership entity to persons who are not actively engaged in the management of the receivership entity;

vi. Engage and employ managers, agents, employees, servants, attorneys, accountants, appraisers, and other persons to evaluate, marshal, conserve, hold, manage and protect any receivership property. Any federal, state or local government employee who may be placed voluntarily at the service of the receivership entity may be engaged by the receiver as he deems necessary in the performance of his duties and responsibilities in discharging the authority conferred by this order. No federal, state or local government shall be

compensated for the use of employees so engaged by the receiver without the approval of this Court;

vii. Make such payments and disbursements from the receivership properties and incur such expenses as may be necessary and advisable in discharging his duties as receiver, or for the proper conduct of any usual and lawful business of the receivership entity and to present to this Court from time to time an accounting of all such payments disbursements and expenses;

viii. Institute, prosecute, defend, compromise, intervene in, seek stays in, or become a party to, such suits, actions or proceedings at law or in equity as may in the receiver's opinion be necessary for the collection, recovery, protection, maintenance or preservation of the receivership properties; and

ix. Present to this Court as soon as practicable a written report reflecting the existence and value of all receivership properties, the extent of any liabilities, both those claimed by others to exist and those which the receiver believes to be the legal obligations of receivership entities, and any further information the receiver believes may assist this Court in the administration of this receivership.

\*                               \*                               \*

E. That the receiver may initiate discovery immediately to facilitate his search for assets, books, records, creditors, and debtors;

\*                               \*                               \*

G. That persons in control of assets, books, and records of the receivership entities, or their physical locations, shall assist the receiver in executing his duties under this order. If entry to the offices cannot be had by conventional means, then the receiver is authorized to cause a locksmith to open the doors, or to use force, if necessary.

The Davidson County Chancery Court retains sole and continuing jurisdiction over this Receiver pursuant to its authority to amend [the order appointing the receiver] from time to time." T.C.A. §48-64-303(c). Consequently, all activities concerning the running or winding down of CPLA should proceed under the supervision of the Davidson County Chancery Court.

**Real Estate**

-49-

Concerning distribution of the real property, the trial court ruled that "[t]he real estate...paid for with CPLA checks [is] property of the Estate." This ruling is in error. The ownership of this real estate is not a question within the purview of the probate court. T.C.A. §31-2-103 reads, in relevant part, as follows:

**31-2-103. Vesting of estate–Net estate.–**

...The real property of a testate decedent vests immediately upon death in the beneficiaries named in the will, unless the will contains a specific provision directing the real property to be administered as part of the estate subject to the control of the personal representatives....

We have reviewed Ford's Last Will and Testament and we find no "specific provision directing the real property to be administered as part of the estate subject to the control of the personal representatives." Ford's Will states, in relevant part, as follows:

All the rest and residue of my estate, including assets of every kind and character and wheresoever situated which I may own or to which I may in any way be entitled at the time of my death . . . shall constitute my "residuary estate" and shall pass as hereinafter provided. I hereby give, devise, and bequeath my residuary estate to the Trustee, in trust, to hold and administer a residuary trust, which shall be designated The JAMES FORD, M.D. Residuary Trust (herein called the "Residuary Trust"), for the use and benefit of my mother and my son and siblings, as therein provided.

Consequently, all of the real estate, which was in Ford's name personally, vested, for purposes of jurisdiction, in his testate assigns upon his death. *See* T.C.A. § 31-2-103.

In any event, the evidence preponderates against the probate court's ownership determination. It is undisputed in this record that monies from the CPLA account(s) were used to purchase and/or improve many of these properties (*see supra*). This is a fact found by the trial court ("...real estate...paid for with CPLA checks..."). Any monies that flowed from CPLA to purchase or improve these pieces of real estate, which were in Ford's name, are part and parcel of the AG/Receiver's Claim against the Estate.

Since it is undisputed that Ford used CPLA funds to purchase real estate in his name personally, our holding here does not preclude the AG/Receiver from filing suit in a court of proper jurisdiction to recover this property to the corporation and/or to subject the property to their Claim.

**Other Property**

The trial court ruled that "furnishings...paid for with CPLA funds...are property of the Estate." The evidence preponderates against this ruling. As discussed *supra*, Ford used CPLA funds to purchase antiques, oriental rugs, medical supplies and, perhaps, electronics for his own use. Some of these items were auctioned as part of the Estate. To the extent that monies from CPLA went toward the purchase of any and all of these items that were used by Ford in any facility or residence other than the daycare centers, the funds gained from the sale of these items and/or the items themselves are part of the AG/Receiver's Claim against the Estate. The Receiver, pursuant to the "Receiver Order," should be allowed to conduct any further discovery that may be necessary to prove this portion of the Claim.

**Stock**

The trial court ruled as follows concerning stocks purchased in Ford's name, with CPLA funds: "The...bank stocks....paid for with CPLA checks are the property of the Estate." This ruling was in error. The record indicates that Ford used CPLA funds to purchase stocks for his own benefit from both Pershing and MemphisFirst. To the extent that CPLA funds can be traced to stock purchases in Ford's name, the funds are part of the AG/Receiver's Claim against the Estate. The Receiver, pursuant to the "Receiver Order," should be allowed to conduct any further discovery that may be necessary to prove this portion of the Claim.

**Cash and Checks to Ford Personally**

The record shows that there were hundreds of thousands of dollars taken from CPLA's account(s) in the form of checks payable to Ford and to "Cash." Stanley Blue testified that he cashed these checks and gave the money to Ford. Concerning where these funds went, the trial court found that "[p]rior to June 1994 and the receipt of state funds, the proof is clear that money was being spent from some source, *presumably* Dr. Ford, in order to pay people, in order to rehabilitate buildings, and in order to buy equipment, but there has been no direct proof as to the amount spent and the source of funds." It is true that there is nothing (other than conjecture) in this record to indicate that Ford made personal loans to CPLA or that Ford used these funds to pay for work done to any of the facilities. Despite this lack of evidence, the trial court makes the following finding:

> 38. The proof is that Dr. Ford ran these businesses. He hired and fired. He bought, remodeled, and improved properties. He signed checks. There is no question that Dr. Ford advanced money, but how much we don't know. Virtually all of the funding – other than his advances – came from the State; however, there is no indication of the Department of Human Services auditing anything and this has been going on for years. People who run businesses, be they for profit or not-for-profit businesses, are entitled to compensation, and

the Court finds that monies flowing to or for Dr. Ford were either repayments of loans or compensation.

Again, there is no evidence in this record to support a finding that Ford loaned money to CPLA or that Ford was entitled to receive (and, if so, the amount of) compensation. Since the evidence preponderates against the trial court's findings concerning monies flowing to, or for the benefit of Dr. Ford, and monies drawn from CPLA for "Cash," we find that any funds drawn from CPLA for cash and any CPLA checks made payable to Ford are properly charged against the Estate as part of the AG/Receiver's Claim on behalf of CPLA, unless the Estate can show sufficient proof that these funds were spent for the benefit of CPLA, and not for Ford's personal benefit. The Receiver, pursuant to the "Receiver Order," should be allowed to conduct any further discovery that may be necessary to prove this portion of the Claim.

## CPLA monies used to pay Professionals who Represent the Estate against CPLA

The AG argues that the trial court erred in using money generated by CPLA's nonprofit daycare business to pay professionals who represented the Estate against CPLA. In its Final Order the probate court "reserve[d] the right to set fees and applicable fees to counsel and other fiduciaries out of daycare operation to the extent the services rendered relate to the daycare operation." From our review of the record, it appears that the trial court authorized use of CPLA income to pay fees and expenses incurred by the Estate during the investigation and litigation of the Claim and during efforts to transfer corporate assets to the LLCs owned by the Estate (e.g. attorney A.C. Hooper was paid $1,561.55 in expenses and $22,997.04 in fees to set up the LLCs). Based upon our finding, *supra,* that the probate court had no authority to set up LLCs and transfer CPLA funds/property into those LLCs, using CPLA funds to expedite the formation of the new entities and the transfer of funds/property was in error. On the other hand, any fees that relate directly to the daycare or benefit the daycare may properly be paid from CPLA funds. However, the decision of whether, to what extent, and for what purpose CPLA funds will be distributed is a matter properly within the auspices of the Receiver and not the probate court. Therefore, we reverse the Final Order to the extent that it reserves, to the probate court, any right to expend CPLA funds for any purpose. Concerning monies already distributed, we remand the matter for such further proceedings as may be necessary to determine whether those expenditures benefitted the corporation and, if not, whether and to what extent those funds should be charged against the Estate as part of the AG/Receiver's Claim.

## CPLA Property

The trial court ruled that "[t]he four daycare center businesses known as "Children's Palace Learning Academy, are the property of Children's Palace Learning Academy, a Tennessee nonprofit corporation; including the tangible assets, streams of income from the State, the goodwill, and the things listed as business assets." On appeal, the Estate contends that this holding was in error. We disagree. We affirm the Final Order of the probate court to the extent that it finds that the tangible and intangible assets of CPLA are CPLA property. In addition, we

find that any income or property, belonging to CPLA, that was transferred, pursuant to the March 19, 2002, or any subsequent, Order, to any of the LLC should also be awarded to CPLA. Although the LLCs may continue to function as separate entities, based upon our discussion above, they have no right to any CPLA property, money, license, etc. We remand for such further proceedings as may be necessary to determine the extent of transfers of CPLA property to the LLCs.

**Conclusion**

We reverse any and all Orders that allow for the continuation of business under the direction of the probate court. Full governance of CPLA is properly with the Receiver under statutory authority and that conferred by the Davidson County Chancery Court. The running/winding down of CPLA is to be under the auspices of the Davison County Chancery Court. Any funds or property belonging to CPLA, which have been transferred to the LLCs (set up pursuant to the probate court's March 19, 2002 Order) are to revert immediately, and under the guidance of the Receiver, to CPLA. Any and all records pertaining to CPLA, both before and after the March 19, 2002 Order, are to be turned over to the Receiver pursuant to the chancery court's "Receiver Order." Concerning monies distributed in the setting up and/or transfer of CPLA property to the LLCs and/or CPLA monies used to defend the Estate against the AG/Receiver's Claim, we remand the matter for such further proceedings as may be necessary to determine whether those expenditures benefitted the corporation and, if not, whether and to what extent those funds should be charged against the Estate as part of the AG/Receiver's Claim. We reverse the Final Order of the trial court to the extent that it reserves any right to expend CPLA monies for any purpose.

Concerning the Claim against the Estate, pursuant to the "Receiver Order," the Receiver is to be joined/substituted for the AG on the Claim. We affirm the Final Order of the probate court to the extent that it finds that CPLA is a nonprofit public benefit corporation. We affirm the Final Order to the extent that it confers the tangible and intangible assets of the corporation to CPLA, and to the extent that it denies the Estate's statute of limitations defense. We reverse the Final Order to the extent that it grants real estate, bank stock, individual stocks, and furnishing paid for with CPLA money to the Estate. Any funds traceable from CPLA for the purchase of real estate, bank stocks, individual stocks, furnishings, and any other property purchased in the name of, or for the benefit of, any individual or entity other than CPLA, are part of the AG/Receiver's Claim. In addition, CPLA checks made to "Cash" and to Ford personally are charged against the Estate as the evidence preponderates against the trial court's findings that these funds were for repayment of loans and/or for compensation.

The case is remanded to the probate court for such further proceedings as may be necessary consistent with this opinion. Costs of this appeal are assessed one-half to co-executrices, Joyce Ford-Miller and Barbara Branch, and their sureties and one-half to the State of Tennessee.

-53-

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.